HOLDRIDGE, J.
*945 The defendant, Monique O. Kitts, was charged by amended grand jury indictment on count one with principal to second degree murder, a violation of La. R.S. 14:30.1, and on count two, conspiracy to commit second degree murder, a violation of La. R.S. 14:26 and La, R.S. 14:30.1, and she pled not guilty. After a trial by jury, the defendant was found guilty as charged.[1] The defendant was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The trial court denied the defendant's combined motion for arrest of judgment, postverdict judgment of acquittal, and/or new trial. The defendant now appeals, assigning error to the sufficiency of the evidence, the lack of disclosure of the relationship between the prosecutor and the judge, the excusal of all teachers and students during the jury voir dire, the trial court's denial of the defendant's Batson challenges, evidentiary rulings, prosecutorial statements, and alleged prosecutorial misconduct.[2] For the following reasons, we affirm the conviction and sentence on count one and remand with instructions.
The record shows the trial court did not impose a sentence on count two.[3] It is well settled that a defendant can appeal from a final judgment of conviction only where a sentence has been imposed. La. Code Crim. P. art. 912(C)(1) ; State v. Chapman , 471 So.2d 716 (La. 1985) (per curiam). In the absence of a valid sentence, the defendant's appeal is not properly before this court. See State v. Blackburn , 2009-0178 (La. App. 1st Cir. 6/12/09), 2009 WL 1655484 (unpublished); State v. Soco , 94-1099 (La. App. 1st Cir. 6/23/95), 657 So.2d 603. Accordingly, the defendant's conviction on count two is not properly before this court on appeal and we do not address the assignments of error *946 in regard to count two. After sentencing on count two, the defendant may perfect a new appeal concerning count two.
STATEMENT OF FACTS
On June 9, 2010, Officer Thomas Southon, who was employed as a patrol officer with the Addis Police Department (ADP) at the time, was dispatched to the residence of Corey Kitts, the victim, and Monique Kitts, the wife of the victim and the defendant, due to a reported theft or burglary of $4,000.00 and a suspicious red vehicle previously parked across the street from the complainant's residence in an empty lot. Officer Southon was only a half mile away from the residence when he received the dispatch at approximately 7:40 p.m., and arrived within two minutes, but no one was there. The defendant arrived approximately twenty to twenty-five minutes later. She claimed that she had withdrawn over $4,000.00 out of the bank for bills and placed $4,000.00 of it in the nightstand next to her sleeping husband, but that when he woke up to go to work, the money was missing. Officer Southon asked to see the area from which the money was removed and to speak with Mr. Kitts. The defendant did not allow Officer Southon to enter the home to investigate the burglary, stating that she did not want to alarm her daughter. When Officer Southon asked the defendant about a suspicious vehicle reportedly seen across the street from the house earlier that morning, she described the vehicle as a red Mazda. When he asked for Mr. Kitts' phone number, the defendant insisted on calling the victim herself, but did not provide the phone number, and indicated that she would have the victim contact the police.
One month later, on July 9, 2010, Major Paul Marionneaux of the West Baton Rouge Parish Sheriff's Office (WBRPSO) and Detective William Starnes of the ADP were summoned to the Kitts residence due to a reported burglary in progress. Upon entry, the officers noticed that there were no apparent means of a forced entry or exit and saw misplaced furniture, glass, coins, and many other items on the floor. They noted that items of value and a small amount of cash were in open sight, which was inconsistent with a burglary. They announced their presence and as they made their way through the house, they heard someone yelling. They noted the presence of the defendant, and Dorey Kitts and Corey Kitts, Jr. (the children of the defendant and the victim), in the master bedroom. They observed shell casings on the floor and the deceased victim lying in his bed. Based on the location of the shells or casings, they concluded that the shooter was standing when the shots were fired.
Cell phone records for the time period preceding and following the murder, analyzed by WBRPSO Detective Kevin Cyrus, revealed frequent communications among the defendant, codefendant Howard, Corey Knox, and David Johnson. David Johnson worked for Kleinpeter Farms Dairy as a milk deliverer in 2006. Two daycares in Plaquemine were part of his route, one owned by the defendant and the other owned by the defendant's sister. Johnson, who was being trained at the time, was introduced to the defendant by his supervisor. The defendant began making arrangements with Johnson to pay him at a later date and different location when she did not have the money at the time of the delivery. They ultimately began conversing in a flirtatious manner, exchanged telephone numbers, and developed a sexual relationship.
In December of 2006, the defendant first began making comments indicating that she was sick of her husband and jokingly suggested that she would be better *947 off if he were dead. Ultimately, she became serious and asked Johnson to find someone to kill the victim. Johnson accepted funds from the defendant on separate occasions over the following months, though, according to Johnson, he had no intention of having someone kill the victim.
In 2008, the defendant asked Johnson if he thought codefendant Howard would kill the victim. Johnson previously introduced Howard, who was a friend of Johnson's brother, to the defendant when recommending her for tax purposes. Johnson told the defendant that Howard probably would kill the victim, but kept the entire $1,000.00 that she again gave him, and never spoke to Howard about it. Johnson denied that the defendant ever asked him again to contact Howard, stating that he assumed that the defendant subsequently spoke to Howard directly.
Knox testified that he and Howard were friends for about thirteen years, and that Howard sometimes referred to him as "Cousin" although they were not actually cousins. Knox confirmed that one day Howard called and asked him if he wanted to make some money. Knox initially said yes, but when Howard told him he would have to kill someone in exchange for the money, Knox told him, "Hell, no." According to Knox, Howard persisted, telling him that it would be easy and that the door would be unlocked, but he still declined. He and Howard drove by the Kitts residence during the nighttime hours on two separate dates before the actual murder took place. A day or two before the actual murder, they pulled up at the residence (during nighttime hours) and Howard walked into the victim's yard. Knox testified that he was unsure as to what took place after Howard entered the yard, stating that Howard was not gone for long.
On the day of the murder, Howard called Knox from a Jack-in-the-Box on Plank Road and told him that he was having car trouble and needed a ride to get a package of money. Knox confirmed that when he picked up Howard from the Jack-in-the-Box between 8:00 and 9:00 that morning, he was driving his mother's gray Durango. Knox further identified the photograph of the vehicle in evidence. Howard pointed out the Kitts' residence just as Knox passed it. Knox backed up and parked his vehicle in front of the residence, and Howard exited the vehicle and walked along the side of the house. While his vehicle was parked in front of the Kitts residence with the engine running, Knox saw a neighbor come outside to warm up his vehicle. Howard came back to the car about two minutes later, jumped in, told Knox he was ready to go back to the Jack-in-the-Box, and gave Knox approximately two hundred dollars retrieved from a white envelope that he had in his hand when he reentered the truck.[4] According to the autopsy report, the victim suffered gunshot wounds to the neck, face, and head, and died of the multiple perforating gunshot wounds.
SUFFICIENCY OF THE EVIDENCE
In assignment of error number one, the defendant argues that a rational trier of fact could not find the evidence presented herein sufficient to prove guilt beyond a reasonable doubt. The defendant contends that there was no eyewitness to the killing, no murder weapon, no fingerprint or DNA evidence to implicate the alleged triggerman, and no camera image of the alleged getaway vehicle. She also *948 stresses that there was some unidentified DNA on the victim's body. The defendant argues that the testimony of Knox and Johnson was uncorroborated and should have been treated with great caution. She further argues that the testimony of the expert witnesses did not provide any support for the conviction. Further, the defendant argues that the evidence failed to exclude every reasonable hypothesis of innocence. She specifically notes that the State stipulated that several women had an affair with the victim and argues that one of the women may have been the donor of the unidentified DNA found on the victim's body.
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV ; La. Const. art. I, § 2. The constitutional standard for testing the sufficiency of the evidence, enunciated in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged and defendant's identity as the perpetrator of that crime beyond a reasonable doubt. State v. Jones , 596 So.2d 1360, 1369 (La. App. 1st Cir.), writ denied, 598 So.2d 373 (La. 1992). See also La. Code Crim. P. art. 821(B) ; State v. Ordodi , 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The Jackson standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patorno , 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Captville , 448 So.2d 676, 680 (La. 1984).
Louisiana Revised Statute 14:30.1(A)(1) defines second degree murder, in pertinent part, as the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm. Specific criminal intent is that "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Thus, specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. State v. Buchanon , 95-0625 (La. App. 1st Cir. 5/10/96), 673 So.2d 663, 665, writ denied, 96-1411 (La. 12/6/96), 684 So.2d 923.
The State bears the burden of proving those elements, along with the burden to prove the identity of the defendant as the perpetrator. State v. Draughn , 2005-1825 (La. 1/17/07), 950 So.2d 583, 593, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. A positive identification by only one witness is sufficient to support a conviction. State v. Weary , 2003-3067 (La. 4/24/06), 931 So.2d 297, 311, cert. de *949 nied, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006), quoting State v. Neal , 2000-0674 (La. 6/29/01), 796 So.2d 649, 658, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24. Mere presence at the scene of a crime does not make one a principal to the crime. Only those persons who knowingly participate in the planning or execution of a crime are principals to that crime. An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. See State v. Pierre , 93-0893 (La. 2/3/94), 631 So.2d 427, 428 (per curiam). Accordingly, the mental state of one defendant may not be imputed to another defendant. State v. Bean , 2004-1527 (La. App. 1st Cir. 3/24/05), 899 So.2d 702, 707, writ denied, 2005-1106 (La. 11/3/06), 940 So.2d 652, writ granted on other grounds, 2005-1106 (La. 3/8/06), 925 So.2d 489.
After his encounter with the defendant before the murder, Officer Southon reported to his lieutenant that based on her level of nervousness and suspicious behavior, he was not certain that a burglary had actually taken place at the residence. Trooper Ted Savoy of the Louisiana State Police arrived at the scene on the morning of the murder and helped secure the scene. While outside of the residence, Trooper Savoy encountered the victim's family members including the defendant. He observed the defendant as she emotionally got down on her knees in the driveway, put her face in the palms of her hands, and stated, "My God, what have I gone and done?" Trooper Savoy reported the defendant's statement to the chief of police on the scene. After reporting the statement to other police officers at the Addis Police Department, Trooper Savoy made an official witness statement on a later date, August 11, 2011, documenting what he heard the defendant state. Trooper Savoy admitted that he was not certain that he quoted the defendant verbatim but was sure that he provided the gist of her statement and expression. Detective Starnes sent DNA buccal swabs taken from the victim's body to the Louisiana State Police Crime Laboratory, with results showing one major and one minor contributor, including the victim and an unknown source.
Johnson responded positively when asked if the victim's death would allow him to have a permanent relationship with the defendant.[5] The defendant told him that she would receive one million dollars in insurance proceeds in the event of the victim's death. When Johnson informed the defendant that he knew someone who would kill the victim, she gave him $2,000.00 to pay the individual for the murder. However, Johnson indicated that he did not attempt to hire anyone, testifying, "I just wanted the money." The defendant subsequently inquired as to why the murder had not been committed, and Johnson told her in part, "I guess he just jacked us," maintaining his claim that he did not actually have anyone in mind. When the defendant later confronted him about the issue, he again told her that he knew someone who would murder the victim. Johnson had discussed the defendant's request with his friend Darnell Sylve. The defendant gave him $1,000.00 to pay Sylve *950 and a printout of the victim's work schedule. Johnson kept one-half of the money, and gave Sylve the other half of the money, the Kitts' address, and the copy of the victim's work schedule. Johnson denied that he and Sylve actually did anything to assist the defendant with the victim's murder, stating as follows when asked what he told Sylve, "I told him what she wanted done and I told him where they lived so that if she wanted to talk to him, he could kind of mess her around." The defendant later paid Johnson an additional $1,000.00 after he told her that he was certain that his cousin's boyfriend would kill her husband. The promise was again fabricated, as he only wanted to get more money from the defendant.
In 2010, when Johnson and his wife separated, the defendant leased an apartment for Johnson in her name. Johnson specifically received the funds for the apartment from Howard. On or about June 9, about one month before the victim's murder, Howard called Johnson to arrange to meet him at one of his delivery stops. When they met up after lunchtime, Howard, who was driving a red four-door Pontiac at the time, told Johnson that he attempted to kill the victim, but the victim got away and made it into his residence. Howard further stated that the defendant was going to pay him to commit the killing. Howard asked Johnson to drive for him on the next attempt and Johnson told Howard to leave it alone, noting that he was concerned that the police would assume that he was involved because he was having an affair with the victim. Later that day, the defendant called Johnson and described the same attempt by Howard, noting that the victim was able to enter their residence. She stated that the victim called the police, and further told Johnson that when the police arrived, she gave them a false description of the vehicle involved.
Later, weeks after the murder had taken place, the defendant and Howard returned to Louisiana from Atlanta, where Howard was residing at the time. The defendant confessed to Johnson that she had the victim murdered, but would not confirm the murderer's identity. Johnson also spoke to Howard upon their return and he confessed to Johnson that he had successfully killed the victim. Prior to the murder, the defendant gave Howard a key to the residence, but she did not know ahead of time exactly what day he would commit the murder.[6] Johnson stated that Howard described the murder in detail, specifically indicating that he entered the house, went to the room where the victim was sleeping, called the victim's name out loud, and shot the victim just as he "kind of woke up," noting that Howard did not tell him how many times he shot the victim before running out of the house. On his way to Atlanta, Howard dismantled the gun and threw the pieces out of the car window. Sometime after Howard's confession, when Johnson took a trip to Atlanta, Howard further informed him that an unnamed cousin assisted him with the murder as the driver and that they used his cousin's mother's vehicle, a gray Durango. Howard further indicated that the defendant gave him the money that he used to pay the driver, and allowed him to use her debit or credit card, but stated that she was indebted to him for one hundred thousand dollars according to their agreement. When he did not get the money, he began making threats.
*951 Johnson testified that he did not know why he received a target letter indicating he was part of the investigation for an indictment in this case, along with the defendant and Howard. Johnson questioned the defendant as to why he was being indicted, insisting that he did not have anything to do with the murder. Johnson testified that when he met with the police, he did not tell them about his affair with the defendant, noting that the defendant had previously informed him that she concealed or denied the affair when she interviewed with the police because she did not want them to think that he was involved in the victim's death.
While alerting the police that the defendant and Howard never made incriminating statements over the phone, Johnson agreed to assist them in obtaining recorded telephone conversations with the defendant and Howard. Johnson further noted that codefendant Howard used a video chat app called "Tango" because such phone calls would not be in his phone records. During their conversation, Howard repeatedly denied involvement and reassured Johnson that he, the defendant, and Knox would not lie to the police to implicate him in the murder. Johnson testified that he did not confront or question Howard about his denial of his involvement because he did not want Howard to realize that he was being recorded. During his recorded call with the defendant, he talked about the police becoming aware of their affair, but she did not make any incriminating statements about the murder.
Johnson denied fabricating his story in order to avoid prison. Johnson confirmed that he lied to the police when they asked if he and the defendant had a sexual relationship and if the defendant ever told him that she had anything to do with the murder of her husband. He also testified that he was lying to the police when he told them that the defendant was depressed after her husband's murder. He further stated that he and the defendant continued to have sex after the murder.
Darnell Sylve testified that Johnson told him that he was using the defendant for money and asked him if he would like to make some money as well. Sylve stated that Johnson gave him five hundred dollars "[t]o just corroborate his story that he was looking for somebody for her." Sylve indicated that Johnson also gave him a map of the residence's location and the victim's work schedule, which he discarded. Sylve stated that he did not take the notion of the defendant killing her husband seriously because of the small amount of money involved. He further stated that he did not know the victim, the defendant, Howard, or Knox. Sylve acknowledged that in his first interview with police, he did not say anything about someone wanting to hire him to kill someone.
On the morning of the murder, July 9, 2010, Sean Douglas, the Kitts' neighbor, came outside to move his daughter's vehicle and saw a silver vehicle with a large chrome grill backed in behind the victim's truck on the side of the street. Douglas positively identified the photograph in evidence of a gray or silver Durango as depicting the vehicle that he saw that day behind the victim's truck. He could not tell whether or not someone was in the vehicle when he saw it.
Knox admitted that he was involved in the murder, stating that he wanted to tell the truth about what happened and get it off of his chest. When specifically asked if he knew why Howard went into the victim's house, Knox stated that he knew Howard had a gun at the time and further stated, "I ain't going to say I didn't know he was going [to] kill somebody [be]cause like I say I didn't think he had the heart to do it. But we did go there. And I knew he *952 wanted somebody dead there." Knox was unsure of the specific date and time, though he was sure that it was in June or July of 2010 during the morning hours. He also admitted that he only assumed Howard had a gun. Knox stated that he did not know David Johnson or the defendant and denied that Johnson or the defendant ever asked him to kill someone. Knox further stated that he remembered seeing the victim's house on the news and was unsure if the photographs in evidence depicted the house in question.
Bryan Casebonne, a human resources supervisor at the victim's place of employment, Shintech Louisiana, testified regarding the victim's 401K, retirement, and pension plan, including his enrollment for accidental death and dismemberment. The defendant was the primary beneficiary of the accidental death and dismemberment policy while the children, Cory Kitts, Jr. and Dorey Kitts were contingent beneficiaries. According to the 401K plan, the defendant (as the spouse) would receive ninety percent, while the listed non-spouse, Courtney Popeleon, would receive ten percent. The victim's basic life insurance policy and his basic accidental death and dismemberment policy were for $199,000.00 each, his voluntary accidental death and dismemberment policy was for $300,000.00, and he had a supplemental life insurance policy for $50,000.00. A total of $805,000.00 would be paid off at the victim's death. About two weeks after the victim's death, Michelle Hickner, a human resources manager at Shintech Louisiana, received a phone call from the defendant inquiring as to the procedure of the disbursement of the victim's paycheck, remaining vacation time, 401K, life insurance and pension plans. The defendant made several frequent calls with similar inquiries during the following months.
Lorace Watson, who has two children with codefendant Howard's brother, confirmed that codefendant Howard and his mother Diane Howard told her to lie to the police, specifically instructing her to say that codefendant Howard was with her the whole day on July 9, 2010. She initially told the police that Howard could have been with her during the day in question. At trial, Watson acknowledged her phone records and admitted that Howard was not with her all day. She confirmed that he called her at 12:43 p.m., that he dropped his mother off at her house that afternoon[7] , and that she first saw him between 3:00 and 4:00 in the afternoon, after he arrived at the birthday party for her daughter Dimari at the Marriot Hotel. Watson noted that Howard, who was normally very playful, sat with his body bent over and his head down.
Detective Cyrus analyzed the cell phone records in this case. Specifically regarding the records of the defendant and Howard, Detective Cyrus noted the defendant communicated with Howard just over seven hundred times before the murder, from January 27, 2010, to July 9, 2010. Howard's cell phone records indicate that on April 2, 2010, Howard talked to the defendant and travelled to the Addis area, utilizing the tower near the Kitts residence between 8:30 p.m. and approximately 9:30 p.m. that night. Howard's cell phone travelled to the Addis area again on the night of April 3, 2010, and was in the area at 10:06 p.m. until 12:23 a.m., with approximately twenty-five transmissions occurring between him and the defendant during the two-hour time period.
*953 Detective Cyrus noted that the defendant's phone records and surveillance footage of the transactions show that on June 8, 2010, she went to Campus Federal Bank and withdrew funds at approximately 4:00 p.m., and then travelled to the geographic area of Forest Wood Apartments off of Mead Road, where Howard often stayed at the time. On June 9, 2010, at 2:40 a.m., Howard utilized the tower at 4000 Sherwood Forest Boulevard to call Knox in the Greenwell Springs Road location before travelling to the Greenwell Springs location. Approximately one hour later, Knox's cell phone was located in Addis within the vicinity of the Kitts' residence. According to the phone records, around 1:00 p.m. that day, Howard and Johnson's cell phones were within the same geographic area, coinciding with Johnson's claim that he met with Howard that day (when Johnson purportedly declined to be the driver for the next attempt to kill the victim). Later that evening, at 7:17 p.m., the defendant received a phone call from Shintech Louisiana, followed by a phone call by the defendant to Howard at 7:40 p.m., and a simultaneous phone call to 911 by the victim. The records further show that the defendant and Howard's cell phones were in a common area the next day, June 10, 2010.
On the morning of the murder, beginning at approximately 6:42 a.m., Watson's cell phone and Howard's cell phone were hitting at different towers throughout the morning, indicating that the phones were not in the same location that morning. Detective Cyrus also specifically noted that between 8:15 a.m. and 8:45 a.m., Howard's cell phone was located in the Brownsfield area, within the range of the tower for the area including the Jack-in-the-Box on Plank Road. The records further indicate that Howard's cell phone subsequently travelled to the tower located within the vicinity of Knox's home address. There were no records for the location of Howard's phone between 8:45 a.m. and 9:45 a.m., which according to Detective Cyrus indicated that the phone was off the grid due to the absence of a transmission. Detective Cyrus further had records to show that Johnson's cell phone was hitting off of towers located in East Baton Rouge Parish at the time of the murder and that it did not travel to West Baton Rouge where the Kitts' residence was located. During an approximate two week period following the murder, between July 9, 2010 and July 23, 2010, there was no cell phone communication between the defendant and Howard in the records. After July 23, 2010, the records included seven thousand, eight hundred ninety-nine communications between the defendant (including those made with a new phone number) and Howard.
Jeffery Aucoin, an expert in internal auditing, fraud examination, and financial forensics, reviewed the Campus Federal Bank records for the Kitts family and the daycare business accounts, Howard's certified employment records, and the defendant's credit report. Aucoin testified that several withdrawals by the defendant coincided with Howard's absences from work. For example, Howard was off from work two days following a withdrawal of $8,200.00 by the defendant on November 5, 2009. On December 4, 2009, the defendant withdrew $7,200.00, a day that Howard did not go to work. On February 24, 2010, Howard's day off from work, the defendant withdrew $7,300.00. Similarly, on June 8, 2010, the defendant withdrew $4,200.00 and Howard was off from June 8 to June 10, 2010. On July 7th and July 8th, 2010, Howard was off from work and the defendant made withdrawals of $6,000.00 and $1,100.00. Aucoin further testified that while the total withdrawals during 2009 was $52,770.00, the total withdrawals for *954 the portion of 2010 preceding the victim's murder was $105,000.00.
The defendant testified that she and the victim got married in 1993. The defendant denied having her husband killed or paying anyone to do so. She admitted to having an affair, beginning in July of 2006, with Johnson during her marriage, and to writing the email in evidence in December of 2006, to Johnson. Although she admitted that she and the victim did not have the same relationship that they had from the start, she testified that it was her intention to stay with her husband for the rest of her life. The defendant denied providing the victim's work schedule or a key to her residence to anyone before the murder. The defendant admitted to acquiring an apartment for Johnson and purchasing items for Howard, indicating that she just wanted to help them, and she specifically denied any knowledge of Howard having anything to do with the victim's murder. The defendant testified that the missing $4,000.00 reported by the victim was later discovered in the washing machine by their daughter, Dorey. The defendant further denied making the statement after the murder to the effect of "what have I gone and done," stating that she instead repeatedly exclaimed, "oh, Lord, what am I going to do now." The defendant confirmed that after her husband's murder, she took two trips to Atlanta, indicating that she was visiting a girlfriend, but conceding that Howard lived in Atlanta at the time and that she saw him while she was there. The defendant denied that she ever had a sexual relationship with Howard, though she confirmed that he would sometimes flirt with her, adding that he flirted with everyone.
The defendant testified that before the victim's death she had heard rumors of him having an affair and that after his death she learned that he had affairs with six different women. Jenneasha Williams confirmed that she had an affair with the victim, contending that they had sex once and were still friends at the time of his death. By the time of the victim's death, their conversations were either work related or small talk. Williams was not sure if the victim had any other affairs.
Rochelle Brady testified that she had known the defendant for twenty-two years and also knew the rest of the Kitts family. She spent time with the Kitts during their marriage, as they would sometimes have lunch together or go to the movies or concerts. She never witnessed any violent treatment among them, and further stated that the defendant had a reputation for being truthful and honest. She came to the scene on the day of the victim's murder and stated that she heard the defendant as she continuously cried uncontrollably and kept asking God for help. April Myles, a former teacher at the defendant's daycare, testified that the Kitts were like family to her and described them as "awesome." She noted that the defendant came to work on the day of the victim's murder and seemed to be her normal self. Myles had known the defendant for over ten years and testified that she knew her to be truthful. The defendant's pastors, Reverend Thomas Wesley and Reverend Debra Connelly, and her friends, Faye Snearl, Shannon Swanson, and Monique West, further testified as to the defendant's reputation for being truthful and honest.
Howard testified that he had a red Grand Am Pontiac at the time of the offense and denied ever having a red Mazda. He moved to Atlanta before the offense, but visited Baton Rouge two to four times a year. He admitted to being in Baton Rouge, visiting from Atlanta, in June of 2010, to see a female friend who lived in Sherwood Forest Apartments. He came back to Baton Rouge in July of 2010 to *955 attend a birthday party for his niece, Dimyra. Howard confirmed that he had known Knox for at least twelve years and that he referred to him as his cousin. He testified that he knew Johnson for fourteen or fifteen years, and confirmed that he gave Johnson money for an apartment. Howard described the defendant as his close friend and confirmed that she had given him money on multiple occasions. Howard denied ever telling Johnson of a failed or successful attempt to kill the victim, or of ever asking Johnson to assist in the murder of the victim. Howard further denied ever receiving money to kill the victim, and he denied that the defendant ever asked him to kill the victim. Howard also denied ever asking Knox if he wanted to make some money to help him kill the victim. Howard claimed that both Johnson and Knox testified untruthfully. Howard denied being in the vicinity of the Jack-in-the-Box on the day of the murder, specifically claiming that he ran errands for Watson all day. Aaron Frazier and Felicia Guillory testified they had known Howard for many years, and that Howard had a reputation in the community for being trustworthy and honest, and that they trusted Howard.
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson , 459 So.2d 31, 38 (La. App. 1st Cir. 1984). Unless there is internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the fact finder, is sufficient to support a factual conclusion. State v. Marshall , 2004-3139 (La. 11/29/06), 943 So.2d 362, 369, cert. denied, 552 U.S. 905, 128 S.Ct. 239, 169 L.Ed.2d 179 (2007). It is the fact finder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. See State v. Hughes , 2005-0992 (La. 11/29/06), 943 So.2d 1047, 1051.
Although the defendant claims otherwise on appeal, Johnson and Knox provided consistent detailed accounts of the plot to murder the victim that were consistent with the phone records, bank records, and the scene of the shooting. The jury was made aware that Knox received a favorable plea bargain in exchange for his testimony, as well as the State's investigation of Johnson. The jury heard and watched the witnesses testify, and evidently chose to credit Johnson and Knox's testimony. Even though the defendant was not the shooter, based on the overwhelming evidence, the jury could have reasonably concluded that she knowingly participated in the planning and execution of her husband's murder.
Thus, in reviewing the evidence, we cannot say that the jury's determination was irrational under the facts and circumstances presented. See Ordodi , 946 So.2d at 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. State v. Calloway , 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). A court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of Due Process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See State v. Mire , 2014-2295 (La. 1/27/16), --- So.3d ----, ----, 2016 WL 314814 (per curiam). After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the State proved beyond a reasonable *956 doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and the defendant's identity as a principal to the offense. Accordingly, assignment of error number one lacks merit.
FAILURE TO DISCLOSE ALLEGED GROUNDS FOR RECUSAL
In assignment of error number two, the defendant argues that the trial court judge who presided in this case, Judge J. Robin Free, and one of the assistant district attorneys representing the State in this case, Tony Clayton, had a duty to disclose to the defense counsel the nature of their relationship, which, unbeknownst to her at the time, was the subject of an ongoing Judiciary Commission proceeding throughout the trial. She asserts that "maybe this was grounds for recusal, maybe not," but maintains that she never was given the opportunity to decide whether she wanted to move for recusal of either the judge or the prosecutor or both. The defendant cites In re Free , 2014-1828 (La. 12/9/14), 158 So.3d 771, 784-85, wherein the Louisiana Supreme Court accepted the recommendation of the Judiciary Commission of Louisiana that Judge Free be suspended without pay for thirty days and be ordered to reimburse and pay the Commission $6,723.64 in costs for violations of the Code of Judicial Conduct and Article V, Section 25(C) of the Louisiana Constitution. The defendant argues that the lack of a disclosure was a violation of Due Process and fundamental fairness which deprived her of a fair trial. The defendant claims that she learned of the "grounds for recusal" after trial and argues that on that basis, the trial court erred in denying her combined motion for arrest of judgment, postverdict judgment of acquittal and/or new trial. In a supplemental brief filed by the defendant, she asks this court to consider this assignment of error in light of the United States Supreme Court's recent decision in LaCaze v. Louisiana , --- U.S. ----, 138 S.Ct. 60, 199 L.Ed.2d 1 (2017). She maintains that Judge Free's failure to disclose potential grounds for his recusal deprived her of the opportunity to seek his recusal, and violated the Fourteenth Amendment's guarantee of due process.
The defendant's arguments in this assignment of error are not related to the evidence, nor does she assert one of the issues in the list of grounds for an arrest of judgment. La. Code Crim. P. art. 859 ; La. Code Crim. P. art. 821. Thus, the statutes governing a motion for arrest of judgment and postverdict judgment of acquittal are inapplicable and the defendant's argument is limited to the denial of the motion for new trial component of her combined motion. See La. Code Crim. P. art. 851(B)(4) and (5). In deciding whether the trial court abused its great discretion in granting or denying a new trial under Article 851(B)(5), we keep in mind two precepts. One, in this provision the trial court is vested with almost unlimited discretion and its decision should not be interfered with unless there has been a palpable abuse of that discretion. Two, this ground for a new trial is based on the supposition that injustice has been done to the defendant, and, unless such is shown to have been the case, the motion shall be denied, no matter upon what allegations it is grounded. State v. Guillory , 2010-1231 (La. 10/8/10), 45 So.3d 612, 615 (per curiam).
"A trial judge is presumed to be impartial. The burden is on the defendant to prove otherwise." State v. Dooley , 38,763 (La. App. 2d Cir. 9/22/04), 882 So.2d 731, 745, writ denied, 2004-2645 (La. 2/18/05), 896 So.2d 30. In Free , the Louisiana Supreme Court noted that Judge Free *957 accepted an invitation to participate in an all-expenses-paid trip on a private jet to a hunting ranch in Texas, extended to him by lawyers in a case before him at or near the time of settlement negotiations, including Clayton, a lawyer who regularly tried cases in his court, and that the trip occurred as soon as the trial was over. The Court held that said conduct harmed the integrity of and respect for the judiciary. Free , 158 So.3d at 785. The Court did not, however, state that the judge should not preside over future cases prosecuted by Clayton.
Louisiana Code of Criminal Procedure art. 674 provides that a motion for recusal of a trial judge is to be made before trial of the matter or at least before judgment. However, in this case the defendant argues that she was unaware of the grounds for recusal before the trial and, as noted, is raising the issue in the context of a motion for new trial. Louisiana Code of Criminal Procedure art. 671 provides:
In a criminal case a judge of any court, trial or appellate, shall be recused when he:
(1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;
(2) Is the spouse of the accused, of the party injured, of an attorney employed in the cause, or of the district attorney; or is related to the accused or the party injured, or to the spouse of the accused or party injured, within the fourth degree; or is related to an attorney employed in the cause or to the district attorney, or to the spouse of either, within the second degree;
(3) Has been employed or consulted as an attorney in the cause, or has been associated with an attorney during the latter's employment in the cause;
(4) Is a witness in the cause;
(5) Has performed a judicial act in the case in another court; or
(6) Would be unable, for any other reason, to conduct a fair and impartial trial.
The Official Revision Comment to La. Code Crim. P. art. 671 provides in part: "Ground (6) is a catchall provision to include circumstances which clearly indicate that the judge would not be able to serve fairly and impartially, even though none of the specified grounds for recusation exist." A judge may recuse himself, whether a motion for his recusation has been filed by a party or not, in any case in which a ground for recusation exists. La. Code Crim. P. art. 672. Further, a judge may recuse himself sua sponte. State v. Franks , 45,818 (La. App. 2d Cir. 11/3/10), 55 So.3d 34, 36, writ denied, 2011-0107 (La. 11/18/11), 75 So.3d 451.
Louisiana Code of Criminal Procedure art. 680 provides the grounds for recusation of a district attorney. That article states that a district attorney shall be recused when he:
(1) Has a personal interest in the cause or grand jury proceeding which is in conflict with fair and impartial administration of justice;
(2) Is related to the party accused or to the party injured, or to the spouse of the accused or party injured, or to a party who is a focus of a grand jury investigation, to such an extent that it may appreciably influence him in the performance of the duties of his office; or
(3) Has been employed or consulted in the case as attorney for the defendant before his election or appointment as district attorney.
A defendant attempting to recuse a district attorney on the basis of a personal interest in the cause which is in conflict with fair and impartial administration of justice has *958 the burden of proving this ground for recusal by a preponderance of the evidence. State v. King , 2006-2383 (La. 4/27/07), 956 So.2d 562, 565. A district attorney may recuse himself, whether a motion for his recusation has been filed or not, in any case in which a ground for recusation exists. A motion to recuse the district attorney shall be in writing and shall set forth the grounds therefor. The motion shall be filed in accordance with Article 521, and shall be tried in a contradictory hearing. If a ground for recusation is established the judge shall recuse the district attorney. La. Code Crim. P. art. 681.
In interpreting the provision of La. Code Crim. P. art. 671(1), the Louisiana Supreme Court in State v. Maduell , 326 So.2d 820, 824 (La. 1976), held that recusal would not be justified upon mere general conclusory allegations, but the disqualifying bias, interest or prejudice must be of a substantial nature. In Maduell , the Court found nothing in the record demonstrating that the ground for recusal had support or that the conduct of the trial judge was anything other than fair and impartial. In the instant case, the defendant has not alleged or shown any specific instances of the judge's partiality or bias, nor any gain that the judge or district attorney would have from the jury finding the defendant guilty.
In State v. LaCaze , 2016-0234 (La. 12/16/16), 208 So.3d 856, 864 (per curiam), cert. granted, judgment vacated, --- U.S. ----, 138 S.Ct. 60, 199 L.Ed.2d 1 (2017) (sometimes referred to as " LaCaze I ") the defendant argued that he was entitled to relief because the trial judge presided over his trial despite an appearance of impropriety. The Court held, "LaCaze has pointed to no evidence that the judge harbored any bias, prejudice, or personal interest in the case, let alone to such an extent that it rendered him unable to conduct a fair trial." LaCaze , 208 So.3d at 864.
Subsequently, in Rippo v. Baker , --- U.S. ----, 137 S.Ct. 905, 197 L.Ed.2d 167 (2017) (per curiam), the United States Supreme Court clarified the standard for judicial disqualification in criminal cases under the federal Due Process Clause. In Rippo , the Supreme Court held that evidence of actual bias is not necessary to require recusal. Rippo , 137 S.Ct. at 907. The Court clarified that the proper inquiry is whether "objectively speaking, 'the probability' of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable' " under the circumstances. Rippo , Id. (quoting Withrow v. Larkin , 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) ). In applying this standard, the issue is "not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." Rippo , 137 S.Ct. at 907 (quoting Williams v. Pennsylvania , --- U.S. ----, 136 S.Ct. 1899, 1905, 195 L.Ed.2d 132 (2016) ).
Based on this clarification of the standard for judicial disqualification, the Supreme Court granted LaCaze's petition for writ of certiorari, vacated the Louisiana Supreme Court's decision in LaCaze I , and remanded the matter to the Louisiana Supreme Court for further consideration in light of the clarified standard of review set forth in Rippo . LaCaze v. Louisiana , --- U.S. ----, 138 S.Ct. 60, 199 L.Ed.2d 1 (2017).
Following the remand, on March 13, 2018, the Louisiana Supreme Court handed down its opinion in State v. LaCaze , 2016-0234 (La. 3/13/18), 239 So.3d 807, 2018 WL 1281112 (sometimes referred to herein as LaCaze II ). Therein, the Court held that Rippo requires a defendant to *959 establish two elements to warrant judicial disqualification under the Due Process Clause. First, the defendant must establish an objective "probability of actual bias." LaCaze II , 239 So.3d 807. Secondly, the defendant must demonstrate that the probability of actual bias rises to a level that "is too high to be constitutionally tolerable" under the circumstances. LaCaze II , 239 So.3d 807.
In LaCaze II , the Supreme Court identified the following instances in which an unconstitutional probability of bias exists under the jurisprudence: (1) the judge has a direct, substantial pecuniary interest in the outcome of the defendant's case; (2) the judge's election campaign received exceptionally large financial donations from one of the parties; (3) the sentencing judge formerly worked as a prosecutor in another case against the defendant and the judge had earlier "communication, correspondence, and cooperation as a prosecutor" with the prosecutor in the other case against the defendant; (4) the judge "presiding at the contempt hearing had also served as the 'one-man grand jury' out of which the contempt charge arose"; (5) the judge has made a critical decision (approved of seeking the death penalty) while a former prosecutor in the pending prosecution; (6) the appellate judge presided over the trial of the matter; (7) the judge has taken bribes from other criminal defendants; (8) the judge has both executive and judicial responsibility in the matter; and (9) the judge was a defendant in a prior litigation involving one of the parties. LaCaze II , 239 So.3d 807.
In LaCaze II , the Court stressed that none of those risks were present in the case before it. The Court reviewed all of the facts of the case under the appropriate standard and concluded that the defendant did not prove a probability of actual bias on the part of the trial judge, and further, did not show that his claims of bias were proven to be "too high to be constitutionally tolerable." LaCaze II , 239 So.3d 807. Thus, the Court held that its original decision in LaCaze I was correct in light of the clarified standard.
Applying the proper standard of review as enunciated by the United States Supreme Court in Rippo and our Supreme Court in LaCaze II , we find that the defendant failed to establish an objective probability of actual bias on the part of Judge Free. None of the risks of an unconstitutional probability of bias identified by the Supreme Court in LaCaze II are present in this case. We do not find a probability that the circumstances for which the trial judge was disciplined in Free , including the 2010 trip, would have rendered an average judge in his position likely to be biased against this defendant in the instant completely unrelated case. Further, there was no direct, personal, substantial, or pecuniary interest in the outcome of the case that may cause an average judge to be biased. Moreover, we find that the defendant failed to demonstrate that her claims of bias were "too high to be constitutionally tolerable." Accordingly, we conclude that the defendant was not entitled to recusal under the Due Process Clause.
Also, there is no indication that the relationship grounds in La. Code Crim. P. art. 671(A)(2) or La. Code Crim. P. art. 680(2) are applicable to the instant case. Moreover, there is no allegation that the judge or district attorney has been employed or consulted as an attorney in the cause or associated with an attorney during the attorney's employment in the cause, or that the judge was a witness in the cause or performed a judicial act in the case. Further, there is no indication that Judge Free was unable, for any other reason, to conduct a fair and impartial trial. Therefore, considering the grounds for recusation *960 of a judge outlined in Article 671 and the grounds for recusation of a district attorney outlined in Article 680, neither article was violated in this case. Based on the forgoing, we find no error or abuse of discretion in the trial court's denial of the defendant's combined motion for arrest of judgment, postverdict judgment of acquittal and/or new trial on this basis. Assignment of error number two is without merit.
EXCUSAL OF TEACHERS AND STUDENTS AS PROSPECTIVE JURORS
In assignment of error number three, the defendant argues that the trial court violated her Sixth and Fourteenth Amendment constitutional rights by automatically excusing all teachers and students from the jury pool over defense objections. The defendant notes that the excluded teachers and students consisted of fifteen females and three males. The defendant argues that the automatic exclusion of these prospective jurors without individualized findings of undue hardship or extreme inconvenience was prejudicial, requiring that her conviction be vacated.
If jury service, whether criminal or civil, would result in undue hardship or extreme inconvenience, the trial court may excuse a person from such service either prior to or after his selection for the general venire, jury pool, or jury wheel. The court may take such action on its own initiative or on recommendation of an official or employee designated by the court. La. Code Crim. P. art. 783(B). No person or group of persons shall be automatically excused. La. Code Crim. P. art. 783(C). A general jury venire "shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race." La. Code Crim. P. art. 419(A).
The defendant bears the burden of proving the grounds for setting aside the venire. Defendants are not entitled to a jury of any particular composition. A venire reflecting exactly the complete representation of every group within a community would be virtually impossible to seat. State v. Lee , 559 So.2d 1310, 1313-14 (La. 1990), cert. denied, 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991). The trial court is vested with broad discretion in excusing prospective jurors for undue hardship. The court's discretion to release or excuse prospective jurors prior to voir dire examination is not to be disturbed unless there is a showing of fraud or collusion resulting in prejudice to the accused. See State v. Williams , 96-1023 (La. 1/21/98), 708 So.2d 703, 710, cert. denied, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998) ; State v. Edwards , 406 So.2d 1331, 1347 (La. 1981), cert. denied, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982).
We note that the defendant did not initially object as the trial court began excusing teachers and full-time students. Under La. Code Crim. P. art. 841, a contemporaneous objection is required to preserve an error for appellate review. The purpose of the contemporaneous objection rule is to allow the trial judge the opportunity to rule on the objection and thereby prevent or cure an error. State v. Hilton , 99-1239 (La. App. 1st Cir. 3/31/00), 764 So.2d 1027, 1035, writ denied, 2000-0958 (La. 3/9/01), 786 So.2d 113. Irregularities or errors cannot be availed of on appeal if they are not objected to at the time of the occurrence. State v. Walker , 94-0587 (La. App. 1st Cir. 4/7/95), 654 So.2d 451, 453, writs denied, 95-1124 & 95-1125 (La. 9/22/95), 660 So.2d 470. Therefore, because *961 the defendant did not object at the time the trial court began excusing teachers and students from the courtroom, this particular assignment of error is not preserved for appellate review.[8]
Moreover, the instant trial was very lengthy, approximately one month, with long hours. The first student excused by the trial court indicated that she was in school full-time and needed to be in class. In dismissing the prospective juror, the trial court agreed that she needed to be in class. The trial court subsequently estimated the length of the case and noted that missing weeks of school could cause a student to fail. We note that there has been no showing of fraud or collusion resulting in prejudice to the accused and find no error or abuse of discretion in the trial court's dismissal of teachers and students based on undue hardship. Assignment of error number three lacks merit.
B ATSO N CHALLENGES
In assignment of error number four, the defendant argues that the trial court erred in rejecting her Batson challenges to the State's four peremptory strikes against four African-American females. The defendant argues that the trial court failed to make a credibility evaluation in finding that the State provided racially neutral reasons for striking the prospective jurors. The defendant contends that there was evidence tending to prove purposeful discrimination because the State indicated that three of the African-American females, Kathy Nelson, Rhoneise Jarvis, and Samika Butler, were struck because they knew the Kitts family, but the State did not strike a white male, Dylan Hood, who also knew the Kitts family. The defendant notes that the State exercised a total of fourteen peremptory strikes against eight black females, two black males, two white females, and two white males. The defendant argues that her conviction must be vacated because the defense made a prima facie case that the State struck jurors on the grounds of race and gender, and the trial court merely noted the State's reasons without properly evaluating them.
Systematic exclusion of a specific class in the source or sources from which the jury venires are chosen is precluded by law. This principle does not mean that a defendant is entitled to a petit jury which reflects the population of the community in every respect. Lee , 559 So.2d at 1314. Defendants are not entitled to a jury of any particular composition. Taylor v. Louisiana , 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975). A venire reflecting exactly the complete representation of every group within a community would be virtually impossible to seat. Lee , supra. An equal protection violation occurs if a party exercises a peremptory challenge to excuse a prospective juror on the basis of that person's race. Batson v. Kentucky , 476 U.S. 79, 96-97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986) and its progeny. Under Batson the defendant, after timely objection, must demonstrate a prima facie case of purposeful discrimination. The defendant must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Batson , supra.
The defendant may offer any facts relevant to the question of the prosecutor's discriminatory intent to satisfy this burden. In determining whether a prima facie *962 showing of purposeful discrimination has been demonstrated, Batson instructs that the trial court should consider all relevant circumstances, including any pattern of strikes by the prosecutor against black jurors and any questions or statements by the prosecutor during voir dire examination and in exercising his challenges, which may support or refute an inference of purposeful discrimination. If a defendant makes a prima facie showing of discrimination in the use of peremptory challenges, the burden then shifts to the State to offer racially-neutral reasons for the use of the peremptory challenges. A neutral explanation for the challenge may be something less than a justification of a challenge for cause, but must be something more than the prosecutor's assumption or intuition that the juror will be partial to the defendant solely because of the prospective juror's race. The neutral explanation must be one which is clear, reasonably specific, legitimate and related to the particular case at bar. After the prosecutor has presented reasons for his use of a peremptory challenge which on their face are racially neutral, an issue of fact is joined, and the trial court must assess the weight and credibility of the explanation in order to determine whether there was purposeful discrimination in the use of the challenge. State v. Collier , 553 So.2d 815, 819-20 (La. 1989). The ultimate burden of persuasion is on the defendant. State v. Thompson , 516 So.2d 349, 353-54 (La. 1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).
Herein, upon the defendant's Batson challenge, the State provided a detailed explanation which included race-neutral reasons for the strikes against Nelson, Jarvis, Butler, and Shonda Griffin, before the trial court ruled in the State's favor. Nelson initially unequivocally agreed that despite a duty to be fair and impartial, she would not be able to vote guilty in a case involving a life sentence even if sufficient evidence was presented. Jarvis went to high school with the daughter of the victim and the defendant, Dorey Kitts, and acknowledged that being asked to serve on the jury would present a problem to her. She stated that she would not want to "be in her situation." Butler knew the Kitts family and stated that she would not be able to vote guilty in a case involving a life sentence. Griffin similarly stated she did not want to vote guilty on a life offense, but then stated that she could if she was required to do so. Despite the rehabilitation of the jurors at issue, in each case the State provided race neutral reasons. While Hood, a white male, also knew the Kitts family, he claimed that he could be fair and neutral, agreed with the law, did not know about the case, and did not require rehabilitation. The defendant claims that upon her second Batson challenge, the trial court ruled in favor of the State without evaluation. However, the record shows that the State was required to provide explanations as to each prospective juror in question without requiring the defendant to establish a clear pattern or statements by the State that gave rise to an inference of discrimination.
We find that the defendant's reliance on bare statistics to support a prima facie case of both gender and race discrimination is misplaced. A pattern of strikes is only one of the multiple factors that may be considered in making this fact-intense determination. While Batson cites a "pattern of strikes" as an example of the type of evidence that can give rise to an inference of discrimination, another equally significant example Batson cites is the voir dire. See U.S. v. Bergodere , 40 F.3d 512, 517 (1994), cert. denied, 514 U.S. 1055, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995) (citing voir dire colloquy between prospective juror *963 and attorneys which reflected "a legitimate, nondiscriminatory reason why conscientious counsel might desire to exclude the juror from further service"). Based on our review of the voir dire in this case, the trial court did not abuse its discretion in finding that the defendant failed to establish purposeful discrimination. We find no merit in assignment of error number four.
EVIDENTIARY RULINGS
In assignment of error number five, the defendant argues that the trial court made erroneous rulings in regard to two trial witnesses, Lorace Watson and David Johnson. The defendant specifically contends that the trial court erred in ruling that Watson was a witness identified with an adverse party (codefendant Howard), thereby allowing the State to lead on direct examination. The defendant notes that Watson was the State's witness. She contends that Watson was not a relative of a party, but was instead the unwed mother of the children of Howard's half-brother, with whom she had not had a relationship since 2007. The defendant points out that Watson testified that she was not there to help Howard, but was there to tell the truth. The defendant further submits that Watson refused to meet with Howard's attorney but met with the police three times, and argues that she was identified with the State, if anyone. The defendant argues that the trial court compounded its ruling by limiting the cross-examination of Watson to direct questioning, and ruling that the defense could introduce one of Watson's police statements only during its own case-in-chief. The defendant argues that the rulings were not harmless, noting that Watson was the first witness and "her testimony set the tone for the rest of the trial." The defendant further contends that the State was allowed to "put words in her [Watson's] mouth" while the defense was not allowed to confront her with inconsistent police statements. The defendant contends that the trial court's ruling deprived her of her constitutional right to present a defense.
With respect to Johnson, the defendant contends that the trial court erroneously deprived her of a fair trial by allowing the State to question Johnson regarding Facebook live chats, some of which he was not a party to and had no first-hand knowledge of, in violation of various articles of the Code of Evidence. The defendant also argues that the trial court erred in allowing the State to mislead the jury as to the nature of the content of other Facebook communications, some containing explicit language. According to the defendant, the State mislead the jury by suggesting that a homeowner's insurance check referenced in the communications was instead a life insurance check. The defendant additionally contends that while the trial court occasionally sustained defense objections to many of the State's improper lines of questioning on the grounds of hearsay, improper foundation, or leading, the State repeatedly disregarded the trial court's instructions. The defendant specifically argues that the trial court erroneously allowed a line of questioning on the basis of the furtherance of conspiracy, although Johnson testified that he never entered into a conspiracy. The defendant further argues that the trial court erred in not allowing the defense to introduce into evidence and cross-examine Johnson with police statements that were inconsistent with his trial testimony. Finally, the defendant notes that on redirect examination, the State was allowed to ask Johnson leading questions about Knox, and as to whether the mission was accomplished after the defendant met Howard.
Lorace Watson
Generally, leading questions should not be used on the direct examination *964 of a witness except as may be necessary to develop his testimony and in examining an expert witness on his opinions and inferences. However, when a party calls a hostile witness, a witness who is unable or unwilling to respond to proper questioning, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions. Generally, leading questions should be permitted on cross-examination. However, the court ordinarily shall prohibit counsel for a party from using leading questions when that party or a person identified with him is examined by his counsel, even when the party or a person identified with him has been called as a witness by another party and tendered for cross-examination. La. Code Evid. art. 611(C) ; State v. Law , 2015-0210 (La. App. 1st Cir. 2/24/16), 189 So.3d 1164, 1178, writ denied, 2016-0926 (La. 4/24/17), 220 So.3d 740. The use of leading questions is largely within the discretion of the trial court; and only a clear abuse of that discretion which prejudices the defendant's rights will justify the reversal of a conviction. State v. Young , 576 So.2d 1048, 1056 (La. App. 1st Cir. 3/5/91), writ denied, 584 So.2d 679 (La. 1991).
Herein, the State called Watson to testify pursuant to Article 611, Subsection C, contending that she is a family member of codefendant Howard and thereby identifies with an adverse party. Watson confirmed that Howard's brother, Damien Richard, fathered her two children and responded positively when asked, "So that's [Howard] like your brother-in-law?" On cross-examination for purposes of the foundation as a witness who identifies with an adverse party, Watson acknowledged that she is not a blood relative of Howard's, although he is the uncle of her children. She further stated that she was present due to a subpoena and was there to tell the truth. When asked if that meant she did not identify with Howard as a party, she stated, "I know Karl Michael [Howard]. Karl Michael is a good friend." When further asked if she identified with the defense, Watson stated, "I mean we're family. I'm not I'm not against him. I don't want to like do anything to hurt him. I'm just here to tell the truth." Watson conceded that she had previously spoken with Howard's attorney over the phone and confirmed that she had spoken to the State as well. She further surmised that she spoke to the district attorney's office two or three times, but did not meet with Howard's attorney, because she no longer wanted to be questioned about the case. While the trial took place in 2014, she estimated that her relationship with Richard ended in 2007, and that she last spoke to Diane Howard (Richard's mother) six to eight months before the trial.
In ruling in favor of the State, the trial court concluded that Watson was identified with Howard, noting that Watson specifically referred to Howard as her "good friend." However, the trial court initially gave the defense leeway in asking leading questions while examining Watson before instructing the defense to only ask direct questions. As the State successfully showed that Watson was identified with the codefendant, we find no error in the trial court's ruling in regard to Watson.
David Johnson
All relevant evidence is admissible, except as otherwise provided by positive law, and evidence that is not relevant is not admissible. La. Code Evid. art. 402. Louisiana Code of Evidence art. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Louisiana Code of Evidence art. 403 states: "Although relevant, evidence *965 may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." In questions of relevancy, much discretion is vested in the trial court, and its rulings will not be disturbed on appeal in the absence of a showing of manifest abuse of discretion. State v. Pooler , 96-1794 (La. App. 1st Cir. 5/9/97), 696 So.2d 22, 46, writ denied, 97-1470 (La. 11/14/97), 703 So.2d 1288.
Assuming a proper foundation, the credibility of any witness may be attacked by extrinsic evidence, including prior inconsistent statements. La. Code Evid. art. 607(D). Admission of the evidence, which bears solely on the issue of credibility, turns on a judicial determination that the probative value of the extrinsic evidence is not substantially outweighed by undue consumption of time, confusion, or unfair prejudice. La. Code Evid. art. 607(D) ; State v. Owunta , 99-1569 (La. 5/26/00), 761 So.2d 528, 529 (per curiam). Provided that the witness has had a fair opportunity "to admit the fact and has failed distinctly to do so," La. Code Evid. art. 613, extrinsic evidence of the statement is admissible, not to prove the truth of the matter asserted, i.e., not for its hearsay content, but to establish the fact of contradiction as a means of impeaching witness's general credibility. Owunta , 761 So.2d at 529.
As stated, herein the defendant argues that the trial court erred in allowing the State to mislead the jury while questioning Johnson and in allowing Johnson to read Facebook communications to the jury of which he did not possess sufficient firsthand knowledge.[9] See La. Code Evid. art. 602. We note that Johnson was subject to cross-examination and the jurors were made aware when Johnson lacked firsthand knowledge. Moreover, the parties agreed to stipulate to the jury that the victim was still alive at the time of the defendant's statement regarding an insurance check and that the Kitts were waiting for an insurance check regarding damage to their home at the time.
Regarding Johnson's pretrial statements, we note that Johnson repeatedly admitted to not being fully forthcoming before the trial and making statements in his pretrial police interviews that were inconsistent with his trial testimony. Although the pretrial interviews were not admitted into evidence in their entirety, the trial court allowed the defense attorney to question Johnson regarding certain interview statements and to have him read statements that were inconsistent with his trial testimony. Since the defendant had already accomplished the impeachment of the witness through his trial testimony, admission of the written document of Johnson's prior inconsistent statement was unnecessary to impeach the witness's credibility under Article 607(D).[10] See State v. Harper , 2007-0299, (La. App. 1st Cir. 9/5/07), 970 So.2d 592, 601, writ denied, 2007-1921 (La. 2/15/08), 976 So.2d 173.
We also acknowledge the common sense and fair-mindedness of jurors. Thus, based on our review of the record, we find that *966 any error regarding the line of questioning or testimony elicited from Johnson was harmless and that the verdict herein was surely unattributable to any such error. See Sullivan v. Louisiana , 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). Considering the forgoing conclusions, we find that assignment of error number five lacks merit.
ADDITIONAL TRIAL COURT RULINGS
In the sixth assignment of error, the defendant lists three trial court rulings that she argues were erroneous and prejudicial. First, she argues that the trial court allowed Dr. Alfredo Suarez to present testimony to inflame the jury that added nothing to the State's case since he did not examine the victim. Second, the defendant argues that the trial court erred in allowing the State to pull out a gun, which was not the murder weapon, and to try to get Howard to demonstrate the use of it despite Howard's testimony that he did not have a gun and never fired one.[11]
Dr. Suarez's testimony
The coroner or a coroner's deputy may testify as to the victim's death or the cause thereof, even where the testifying witness did not perform the autopsy or prepare the report. See State v. Ducre , 596 So.2d 1372, 1381 (La. App. 1st Cir. 1992), writ denied, 600 So.2d 637 (1992). In the case at hand, the defendant did not dispute that the victim was shot and killed, only whether or not she was involved in the murder. The autopsy report indicated that the gunshot wounds were fatal. The only issue was the identity of the perpetrators. Thus, the autopsy report did not address any legal theory of defense. Further, the defendant had ample opportunity to, and, in fact, did cross-examine and recross-examine Dr. Suarez at trial.
Gun introduced at trial
Demonstrative evidence can be admitted into evidence only after it is shown that, more probable than not, the evidence is connected to the case. That foundation can be laid by establishing a chain of custody of the evidence or by visual identification. Once that foundation is established, the weight to be given the evidence is a question for the jury. State v. Kirkley , 470 So.2d 1001 (La. App. 1st Cir. 1985), writ denied, 475 So.2d 1105 (La. 1985), cert. denied, 474 U.S. 1061, 106 S.Ct. 808, 88 L.Ed.2d 783 (1986). Courts have repeatedly held that it is error to allow inadmissible and irrelevant weapons into evidence, but have affirmed the convictions because of the harmless error rule. An error is harmless if the reviewing court finds beyond a reasonable doubt that the verdict rendered at the trial was surely unattributable to the error. Sullivan v. Louisiana , 508 U.S. at 279, 113 S.Ct. at 2081.
At the outset we note that the defendant agreed to allow the State to use the gun as demonstrative evidence during the questioning of Charles Watson, a firearms examination expert of the Louisiana State Police Crime Laboratory. The gun was not the weapon used in the murder, nor was it relevant to the offenses. Assuming that the trial court erred when it allowed the State to again use the gun while questioning Howard, we find that under these particular circumstances, it is beyond doubt that the guilty verdict in this case was unattributable to the display. This court will not *967 set aside a conviction in a criminal case on the ground of improper admission of evidence unless, in the opinion of the court, after an examination of the entire record, it appears that the error complained of has prejudiced the defendant. La. Code Crim. P. art. 921. There was no attempt by the State to link the gun with the crime, nor was there extensive argument by the State regarding the gun. We find no prejudice, and any error that might have occurred was harmless. Considering the foregoing conclusions, this assignment of error is without merit.
PROSECUTORIAL MISCONDUCT
In addition to the arguments addressed above, in assignment of error number six, the defendant argues that the trial court erred in denying her motion for mistrial after the State purportedly led Detective Cyrus in calling for his opinions on the veracity of other witnesses. The defendant argues that the trial court, in denying defense objections and mistrial motions, failed to prevent the jury from being exposed to inadmissible evidence and improper conduct. In assignment of error number seven, the defendant argues that the State precluded the presumption of innocence by making an improper statement in front of the jury during defense counsel's cross-examination of Jeffery Aucoin, a forensic accountant. The defendant specifically notes that as defense counsel asserted that Aucoin could not conclude that the defendant paid Howard, prosecutor Scotty Chaubert objected, stating, "Your Honor, with all due respect, this antic is crazy. This man has been called as an expert not to prove his innocence or guilt. If he was guilty, he would be sitting over there with them." In assignment of error number eight, the defendant similarly argues that the presumption of innocence was further eroded during the State's cross-examination of Howard when prosecutor Clayton stated, "Whose husband was killed and presumably by you?" The defendant notes that the trial court did not rule when both of the defendants objected to the comment. The defendant further notes that as the objections continued, the prosecutor stated, "I'm never going to stop until I'm finished," prompting the defendant to move for a mistrial. The defendant argues that the trial court erred in denying the defendants' motions for a mistrial as well as their request for a jury instruction on the presumption of innocence.
In assignment of error number nine, the defendant argues that a fair reading of the record as a whole, including but not limited to the portions cited in the other assignments of error, reveals continuous prosecutorial misconduct and the trial court's inability or unwillingness to prevent it despite repeated objections and motions for mistrial. In addition to reiterating some of the arguments raised in the other assignments of error, the defendant specifically lists the State's failure to comply with the trial court's order to give the defense notice of any deal within twenty-four hours of the deal being made, followed by an attempt to elicit testimony suggesting that there was no deal. The defendant further argues that the prosecutor conveyed that the State was favored by using such language as, "my jury," "my jurors," "his [the Sheriff's] courtroom", along with instructing a witness to "Raise your right hand" as if the prosecutor was an officer authorized to administer oaths. The defendant concludes that the prosecutor's conduct in this case is remarkably similar to conduct the United States Supreme Court found so improper and prejudicial as to warrant reversal, citing in her original and reply brief Berger v. United States , 295 U.S. 78, 84-85, 55 S.Ct. 629, 631-32, 79 L.Ed. 1314 (1935).
*968 Louisiana Code of Criminal Procedure article 770 provides that a defendant may move for a mistrial when the judge, district attorney, or a court official makes a remark or comment within the jury or judge's hearing, during the trial or in argument, which directly or indirectly refers to: 1) race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury; 2) another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible; 3) the defendant's failure to testify in his own defense; or 4) the judge's refusal to direct a verdict. Louisiana Code of Criminal Procedure article 771 allows the State or the defendant to request that the court promptly admonish the jury to disregard irrelevant or prejudicial remarks made by the judge, district attorney, or a court official when the remarks are not within the scope of La. Code Crim. P. art. 770, or made by a person other than the judge, district attorney or court official, regardless of whether or not the remark is within the scope of La. Code Crim. P. art. 770. The court may grant a mistrial on the defendant's motion if it is satisfied that an admonition is insufficient to assure the defendant a fair trial. La. Code Crim. P. art. 771 ; Pooler , 696 So.2d at 48. A mistrial under La. Code Crim. P. art. 771 is at the trial court's discretion and should be granted only where the witness's or prosecutor's prejudicial remarks make it impossible for the defendant to obtain a fair trial. State v. Miles , 98-2396 (La. App. 1st Cir. 6/25/99), 739 So.2d 901, 904, writ denied, 99-2249 (La. 1/28/00), 753 So.2d 231.
A mistrial is a drastic remedy that the trial court should grant only when the defendant suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial. Determining whether a mistrial should be granted is within the sound discretion of the trial court, and its denial of a motion for mistrial will not be disturbed on appeal without abuse of that discretion. State v. Berry , 95-1610 (La. App. 1st Cir. 11/8/96), 684 So.2d 439, 449, writ denied, 97-0278 (La. 10/10/97), 703 So.2d 603.
Even when the prosecutor's statements and actions are excessive and improper, credit should be given to the good sense and fair-mindedness of the jurors who have seen the evidence and heard the arguments. State v. Bridgewater , 2000-1529 (La. 1/15/02), 823 So.2d 877, 902, cert. denied, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003). The touchstone of Due Process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. State v. Ortiz , 2011-2799 (La. 1/29/13), 110 So.3d 1029, 1034, cert. denied sub nom, Ortiz v. Louisiana , 571 U.S. 827, 134 S.Ct. 174, 187 L.Ed.2d 42 (2013). Consequently, the aim of Due Process is not punishment of society for the misdeeds of the prosecutor, but avoidance of an unfair trial to the accused. While a prosecutor should prosecute with "earnestness and vigor" and "may strike hard blows, he is not at liberty to strike foul ones." State v. Tassin , 2011-1144 (La. App. 5th Cir. 12/19/13), 129 So.3d 1235, 1249, writs denied, 2014-0284, 2014-0287 (La. 9/19/14), 148 So.3d 950 (quoting Berger , 295 U.S. at 88, 55 S.Ct. at 633 ).
The Berger Court held the defendant was prejudiced as a result of the United States attorney's repeated misconduct because, (1) the evidence of the defendant's guilt was weak; and (2) the U.S. attorney's misconduct was not slight but "pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." Berger , 295 U.S. at 88-89, 55 S.Ct. at 633. The Court found that the United States attorney was *969 guilty of misstating the facts in his cross-examination of witnesses; of putting words into the mouths of such witnesses; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner. Berger , 295 U.S. at 84, 55 S.Ct. at 631.
After reviewing the transcript pages cited in assignment of error number six regarding leading questions, we find no abuse of discretion by the trial judge in controlling the examination. Arguably, the State's questions as to whether the cell phone records corroborated witness testimony were not suggestive or leading.[12] A question which does not indicate the answer expected, but merely directs the attention of the witness to the subject in relation to which the witness is to testify, is not a leading one. State v. Nix , 327 So.2d 301, 340 (La. 1975), cert. denied sub nom., Fulford v. Louisiana , 425 U.S. 954, 96 S.Ct. 1732, 48 L.Ed.2d 198 (1976). The use of a leading question is largely within the discretion of the trial court and only a clear abuse of that discretion that prejudices the defendant's rights will justify reversal of a conviction. State v. Cobb , 2013-1593 (La. App. 1st Cir. 3/27/14), 144 So.3d 17, 28. Even assuming, arguendo, that the trial court erred in allowing the prosecution to use leading questions under these circumstances, the defendant has failed to show sufficient prejudice to justify a reversal of her conviction.
Based on our review of the record, we do not find that the prosecutor's statements or conduct at issue rose to the level of the United States attorney's improper argument and conduct in Berger . Further, in contrast to the United States attorney's statements in Berger , the prosecutor's statements herein did not make it impossible for the defendant to obtain a fair trial. Moreover, in this case, there was overwhelming evidence of the defendant's guilt. Thus, we conclude the drastic remedy of a mistrial was not warranted in this case. These assignments of error are without merit.
CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence on count one are affirmed. The case is remanded to the trial court for the imposition of a sentence *970 on count two and correction of the erroneous commitment order.
CONVICTION AND SENTENCE ON COUNT ONE AFFIRMED; REMANDED FOR IMPOSITION OF SENTENCE ON COUNT TWO AND CORRECTION OF THE ERRONEOUS COMMITMENT ORDER.
Higginbotham, J. concurs.
Penzato, J. concurs.

The grand jury indictment in this case charges the defendant along with Karl Michael Howard and Corey Knox with the same offenses. Prior to jury selection, the State made an oral motion to sever Knox's case. The trial court granted the State's motion to sever, and the defendant and codefendant Howard proceeded to trial. The codefendant was found guilty as charged. He also filed an appeal. See State v. Howard , 2017-0779 (La. App. 1st Cir. 12/21/17), --- So.3d ----, 2017 WL 6524547 (unpublished). Howard's conviction and sentence on count one were affirmed, and the case was remanded to the trial court for the imposition of a sentence on count two and the correction of the uniform commitment order.

The defendant filed a reply brief critiquing the State's brief and reiterating her arguments.

The record contains a uniform commitment order which reflects the defendant was sentenced to "LIFE" on count one and "LIFE" on count two. However, neither the sentencing minutes nor the sentencing transcript reflect the imposition of two sentences on the defendant. The sentencing transcript and minutes must prevail over the commitment order. See State v. Lynch , 441 So.2d 732, 734 (La. 1983). We also note that the sentence reflected for count two in the uniform commitment order would be illegal. On count two, the defendant can be "imprisoned at hard labor for not more than thirty years." See La. R.S. 14:26(C) & 14:30.1(B).

Dorey Kitts, the victim and the defendant's daughter, testified that she recalled telling the police that the back door was unlocked when she discovered her father after he had been shot.

At this point of his testimony Johnson also read out loud for the jury an email written by the defendant in December of 2006, wherein she professed her love and desire to have Johnson become a permanent part of her life.

According to Johnson, the defendant specifically corroborated Howard's claim that she provided him with a key before the murder because the victim "beat him in the house the last time." After the murder, the defendant destroyed her cell phone by breaking it up and running over it with her car.

Watson ultimately indicated that she did not actually see who dropped Diane Howard off but that at the time she assumed it was Diane's son, codefendant Howard, who dropped her off.

By the time the defendant objected, the eighteen prospective jurors who identified themselves as teachers, students, and one school principal had already been individually excused after being called one by one and required to state their status.

The Facebook entries included communications by the defendant with other purportedly male associates including the codefendant, some of a sexually explicit nature and one wherein she and the codefendant exclaimed, "thank God," in reference to the victim being at work at the time. In another objectionable passage raised herein, the defendant stated, "Still waiting on my insurance check."

The defendant has made no argument that the prior statements were admissible as non-hearsay substantive evidence under La. Code Evid. art. 801(D)(1)(a), which requires additional evidence to corroborate the matter asserted by the prior inconsistent statement. Harper , 970 So.2d at 601.

In assignment of error number six, the defendant also challenges the trial court's ruling on her motion for mistrial made during the State's questioning of Detective Cyrus on redirect examination. Considering the basis for the motion for mistrial, this argument will be addressed in the following section on prosecutorial misconduct.

Several objections on the grounds of leading and prejudice occurred during the State's examination of Detective Cyrus. On the initial instance, the State asked, "One last time, what was the last communication that took place before, this is Karl Howard's cell phone records, before Karl Howard's cell phone showed no activity?" Following the defense's objection and a warning by the trial court not to lead the witness, the State rephrased the question as follows, "What do these records show at 8:37:07 the morning of the murder?" Secondly, when the witness was asked "If I tell you that Corey Knox testified that they," the defense objected to leading, which was overruled by the trial court. After the trial court permitted the question, the State asked, "Corey Knox testified that they left the Jack-In-The-Box and then traveled to West Baton Rouge and, prior to doing so, they turned their cell phones off or left them there; do those records corroborate that?" Finally, counsel for codefendant Howard moved for a mistrial on the basis of "the cumulative effects of the prosecution's prejudicial statements in front of the jury," in which the defendant's attorney joined, following this line of questioning: "And the last communication is Karl Howard to Monique Kitts?...Code red, right?" The attorneys argued that the use of the term "code red" was prejudicial. The trial court denied the motion for mistrial.