895 So.2d 668 (2005)
Sam ALEXANDER, et al., Plaintiffs-Appellants,
v.
Frank FULCO, et al., Defendants-Appellees.
No. 39,293-CA.
Court of Appeal of Louisiana, Second Circuit.
February 25, 2005.
*670 W. James Singleton, Shreveport, Samuel L. Jenkins, Jr., for Appellants.
Plauche, Maselli, Landry & Parkerson, L.L.P., by Andrew L. Plauche, Jr., Wendy K. Lappenga, New Orleans, for Appellee Employers Reinsurance Corp.
Weems, Schimpf, Gilsoul, Haines & Carmouche, by Brian D. Landry, Shreveport, for Appellees Willis Meeks, Archie Singletary, and Scott Miller.
Pettiette, Armand, Dunkelman, Woodley, Byrd & Cromwell, L.L.P., by Edwin H. Byrd, III, Shreveport, for Appellee Louisiana Insurance Guaranty Association.
Montgomery, Barnett, Brown, Read, Hammond & Mintz, by Lawrence G. Pugh, Tonya M. Short Johnson, New Orleans, for Appellees Silica Products Company, Inc. and M.A. Bell Company.
Johnson, Ferguson, Pipkin & Phillips, by Kristina T. Lambright, Houston, TX, for Appellee Flexo Products, Inc.
Duplass, Zwain, Bourgeois & Morton, by Gary M. Zwain, Dana Anderson Carson, Metairie, for Appellees Fidelity & Casualty Company of New York.
Simon, Peragine, Smith & Redfearn, L.L.P., by Douglas Watson Redfearn, Daniel J. Caruso, M. Davis Ready, New Orleans, for Appellees American Optical Corporation and U.S. Silica Company.
Law Offices of Jim Norris, by William Norris, Duplass, Zwain, Bourgeois & Morton, by Andrew D. Weinstock, Metairie, for Appellee 3M Company.
Before GASKINS, DREW and MOORE, JJ.
DREW, J.:
In this action to recover damages allegedly caused by occupational exposure to silica, 66 plaintiffs appealed a judgment sustaining defendants' exceptions of prescription and dismissing their cause of action. We are constrained to affirm.

FACTS
Mid-Continent Steel Casting Corporation and HICA Corporation owned steel foundries in Shreveport. Mid-Continent later merged with another corporation to form Kast Metals Corporation. Plaintiffs are former employees of the foundries, who worked there between 1954 and 1993.
On January 31, 2003, suit was filed by 42 plaintiffs against:
 the supervisors and safety officers at the foundries;
 executive officers of the foundry owners;
 Louisiana Insurance Guaranty Association and the solvent insurers of the executive officers, safety officers, and supervisors;
 Silica Products Inc., U.S. Silica Company, and M.A. Bell Company, which were silica sand manufacturers; and
 American Optical Corporation and Flexo Products, Inc., which manufactured *671 respiratory protective equipment.
Plaintiffs alleged that they were exposed to dangerous levels of asbestos, silica, and other harmful chemicals or substances while working at the foundries. The petition was amended to add six additional plaintiffs on February 14, and 30 additional plaintiffs on February 21, 2003; thus, 78 individuals were plaintiffs in this action.
Various defendants filed the exception of prescription, arguing that the claims were prescribed on the face of the petition. On August 7, 2003, plaintiffs amended their petition for a third time to read that they "contracted their illness or suffered injury and damage before October 1, 1976, however plaintiffs did not become aware of their injuries until less than one (1) year prior to filing suit." The plaintiffs also amended the petition to state that "they have been in a constant state of fear of contracting such illnesses since learning of such risks which was less than one (1) year prior to filing suit." Additional exceptions of prescription were then filed in response to this third amended and supplemental petition.
Trial on the prescription issue was held on April 6, 2004. After hearing testimony on behalf of the plaintiffs from witnesses who are not parties to the action, the trial court granted the exceptions of prescription. The court noted that despite the burden on the plaintiffs to establish an exception to prescription, the plaintiffs failed to present any evidence of "what [they] knew, or when they knew it, or what they should have known, or some reason for them not knowing about it...." The court found that the evidence showed the plaintiffs had "some idea sufficient to put them on notice" prior to x-ray screenings held beginning on February 2, 2002.
Pursuant to a March 2004 court order, the claims of eight plaintiffs were severed for trial on the prescription issue at a later date. In addition, on April 6, 2004, the trial court dismissed the claims of four plaintiffs who failed to appear for their depositions. Accordingly, the judgment sustaining the exceptions of prescription affected only the remaining 66 plaintiffs. These plaintiffs appealed.

DISCUSSION

Prescription
Plaintiffs first argued that the trial court erred in granting the exceptions of prescription. They contended that prescription could not commence for each plaintiff until he received a medical diagnosis of compensable injury, that the trial court impermissibly shifted the burden of proof on the exceptions of prescription to them, and that the fourth category of contra non valentem non currit praescriptio applies in this matter.
La. C.C. art. 3492 provides that the one-year liberative prescription period for delictual actions begins to run from the date the injury or damage is sustained. Damage is considered to have been sustained, within the meaning of art. 3492, only when it has manifested itself with sufficient certainty to support accrual of a cause of action. Cole v. Celotex Corp., 620 So.2d 1154 (La.1993).
Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. Campo v. Correa, 01-2707 (La.6/21/02), 828 So.2d 502. An injured party has constructive notice of his condition when he possesses information sufficient to incite curiosity, excite attention, or put a reasonable person on guard to call for inquiry. Boyd v. B.B.C. Brown Boveri, Inc., 26,889 (La.App.2d Cir.5/10/95), 656 So.2d 683.
*672 The party raising the exception of prescription ordinarily bears the burden of proof at the trial of the peremptory exception. Spott v. Otis Elevator Co., 601 So.2d 1355 (La.1992). However, when the plaintiff's petition reveals on its face that prescription has run, the plaintiff bears the burden of showing why the claim has not prescribed. Lima v. Schmidt, 595 So.2d 624 (La.1992).
Plaintiffs alleged in their original petition that they contracted their illnesses or suffered injury and damage prior to October 1, 1976. Thus, plaintiffs had the burden of establishing a suspension or interruption of the prescriptive period.
In order to soften the occasional harshness of prescriptive statutes, our courts have recognized a jurisprudential exception to prescription: contra non valentem non currit praescriptio, which means that prescription does not run against a person who could not bring his suit. Harvey v. Dixie Graphics, Inc., 593 So.2d 351 (La.1992).
The doctrine of contra non valentem acts as an exception to the general rules of prescription by suspending the running of prescription when the circumstances of the case fall into one of four categories. Under the fourth category, contra non valentem is applied when a cause of action is not known or reasonably knowable by the plaintiff even though his ignorance is not induced by the defendant. Wimberly v. Gatch, 93-2361 (La.4/11/94), 635 So.2d 206. This fourth category is commonly known as the discovery rule, and it provides that prescription commences on the date the injured party discovers or should have discovered the facts upon which his cause of action is based. Id.
When the trial on the exceptions of prescription was originally held on July 28, 2003, plaintiffs were unprepared to present evidence opposing the exceptions and requested more time to prepare. The trial judge indicated to plaintiffs' counsel that unless the plaintiffs reached an agreement with the defendants about how to handle testimony by plaintiffs, then counsel would have to put on evidence for each claimant. On October 20, 2003, the trial judge signed a case management and scheduling order for the prescription trial.
At the April 2004 trial, plaintiffs attempted to introduce, without making page and line designations, the entire depositions of ten plaintiffs who had been listed on their witness list. Defendants moved to strike the depositions, and had days earlier filed a motion in limine, on the ground that the case management order required page and line designations for depositions. Plaintiffs' counsel explained that he did not designate lines and pages in the depositions because he planned on introducing the entire depositions of the ten plaintiffs who were listed on the witness list provided to defendants on March 23, 2004. The trial court granted defendants' motion because of the plaintiffs' failure to comply with the case management order.
Dr. Philip Pennywell is the Vice-President of Operations for the Singleton Law Firm ("firm"), where he maintains and supervises the firm's class action section. Dr. Pennywell testified that in January 2002, Singleton met with Bobby Simpson, a former employee and union official at the foundries, about settlements received by other former foundry workers. Singleton instructed Dr. Pennywell to contact Simpson because Simpson had stated that he knew of former employees who might want to retain Singleton to look into the settlements.
Dr. Pennywell estimated that he contacted Simpson on January 2 or 3, 2002. *673 Simpson told Dr. Pennywell that many former foundry employees came to his business and discussed the settlements that they had heard others had received. Simpson thought that they might be interested in having the firm investigate the settlements. Simpson stated that he would inform those former employees who came to his business about the Mid-Continent litigation and encourage them to tell others about it. Simpson would get their names and phone numbers and provide them with Dr. Pennywell's phone number. Dr. Pennywell estimated that he began receiving names and phone numbers the next day, and he received them intermittently throughout the month of January 2002.
Dr. Pennywell was assigned to coordinate the Mid-Continent litigation. The day after speaking with Simpson, Dr. Pennywell contacted Cathy Jenkins, the office manager of the Powell Medical Clinic, about taking lung x-rays of the former foundry employees. The clinic agreed the next day to hold the x-ray screenings on Saturdays.
Dr. Pennywell called the workers who had provided their names and phone numbers to Simpson. He also spoke with those who called the firm directly. During these conversations, Dr. Pennywell received basic personal information from them. This information was placed on an interview sheet that the firm had for each former employee contacted.
Flyers were sent to each potential client concerning the date, time, and location of the screenings.[1] These flyers were mailed at least a week in advance of the scheduled screening date. Screenings were scheduled for the plaintiffs on successive Saturdays from February 2 to March 2, 2002. Dr. Pennywell testified that once the workers arrived at the screenings, they provided the remainder of the information requested on the interview sheets and signed a retainer agreement. At the end of each screening session, Dr. Pennywell would pay the Powell clinic for the x-rays and take possession of them.
During Dr. Pennywell's testimony, plaintiffs attempted to introduce fact sheets that had been prepared in compliance with the case management order. Defendants objected to the introduction of the fact sheets as inadmissible hearsay, and the court sustained the objection. These fact sheets were obviously crucial to plaintiffs' case, as was stated in their appellate brief:
Plaintiffs' counsel's entire strategy for the hearing on this exception was to introduce these fact sheets in order to illustrate when the plaintiffs learned of their possibly contracting Silicosis and when their reasonable fear of contracting this disease began.
Plaintiffs' counsel believed that the introduction of the fact sheets was "more feasible and efficient" than having each plaintiff testify.
Following the conclusion of Dr. Pennywell's testimony, the parties stipulated that Bobby Simpson would testify to the same dates as Dr. Pennywell. Cathy Jenkins next testified regarding what took place on the dates of the screenings. Eddie Campell, an x-ray technician, testified that she was one of the individuals who took the lung x-rays. She explained that the x-rays contain the name of the patient and usually the date of the x-ray. Not all of the plaintiffs' x-rays are dated.
Following the presentation of plaintiffs' evidence, plaintiffs' counsel announced his intention to call some of the plaintiffs to *674 testify. The trial court agreed to give counsel the next day to elicit testimony from the plaintiffs. When the trial resumed on April 6, plaintiffs' counsel decided against calling any plaintiffs to testify. Instead, a stipulation was made that each plaintiff first heard of the Mid-Continent Project in early January 2002, the x-rays were taken on the dates indicated on the x-rays, each plaintiff signed a retainer agreement on the date indicated on the agreement, and each plaintiff signed the initial interview sheet on the date indicated on that form. Plaintiffs then rested.
The evidence presented during the trial only provided the court with the background of how the firm decided to initiate the litigation and the screening of possible clients. The court heard no testimony from the plaintiffs about when their conditions were first diagnosed and they learned of the diagnoses, when they first had actual or constructive knowledge of the potential risks to their health from their exposure to silica dust, or when they first had notice of their claim. Because the burden of proof had been shifted to them, it was critical for the plaintiffs to establish that they did not possess information sufficient to incite curiosity, excite attention, or put a reasonable person on guard to call for inquiry more than one year before this lawsuit was filed.
Even after the trial court explicitly expressed its latitude in allowing plaintiffs' counsel to call his clients as witnesses, he opted for a stipulation. According to the stipulation, each plaintiff first heard of the Mid-Continent Project in early January 2002.[2] This would have related to injuries they suffered as far back as 1975. At the very least, this notice in early January 2002 would have placed plaintiffs in possession of information that was sufficient to incite curiosity, excite attention, or put a reasonable person on guard to call for inquiry. Suit was not filed until January 31, 2003, which is obviously more than a year from "early" January 2002.
Moreover, we cannot find that prescription was suspended until plaintiffs received diagnoses of their conditions. There is no evidence in the record from the trial of any diagnosis ever being made of any plaintiff's condition. The trial court was not presented with evidence showing what was done with the x-rays, in terms of examination by someone qualified to make a diagnosis, after Dr. Pennywell took possession of them.
If evidence is introduced at the hearing on the peremptory exception of prescription, the district court's findings of fact are reviewed under the manifest error-clearly wrong standard of review. Carter v. Haygood, XXXX-XXXX (La.1/19/05), 892 So.2d 1261. Based upon our review of the record, the trial court was not clearly wrong in sustaining the exceptions of prescription.

Evidentiary Ruling
Plaintiffs further contend the trial court erred in not admitting into evidence the fact sheets that had been prepared by plaintiffs' counsel. They argue that the fact sheets fall within the business records exception to hearsay.
On October 20, 2003, the trial judge signed a case management and scheduling order for trial on the issue of prescription. In lieu of responding to formal discovery, plaintiffs were ordered to provide defendants with a fact sheet for each plaintiff. The fact sheets were to be on a form attached to the order.
Dr. Pennywell testified that the claimants were contacted to get the information *675 contained on the fact sheets. He supervised the collection of this information, the claimants' review of the information, and the execution of the fact sheets. Dr. Pennywell also testified that the fact sheets had been kept in the regular course of business activity by the firm, and it was a routine practice of the firm to retain these types of documents as part of its file.
The trial court is generally accorded discretion concerning the admission or exclusion of evidence, and a trial court's decision to admit or exclude evidence will not be reversed absent an abuse of discretion. Credit Recoveries, Inc. v. Crow, 37,913 (La.App.2d Cir.12/17/03), 862 So.2d 1146; Holloway v. Midland Risk Ins. Co., 36,262 (La.App.2d Cir. 10 30/02), 832 So.2d 1004, writ denied, 02-3247 (La.3/28/03), 840 So.2d 571.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). Hearsay is not admissible except as otherwise provided by the Evidence Code or other legislation. La. C.E. art. 802.
One exception to the hearsay rule, found in La. C.E. art. 803(6), is a record of regularly-conducted business activity. The article requires that:
1. The record of an event must have been made at or near the time of the event;
2. The record of an event must have been made either by, or from information transmitted by, a person with knowledge;
3. It must be made and kept in the course of a regularly conducted business activity;
4. It was the regular practice of that business activity to make and keep such records;
5. The recorded information must have been furnished to the business either (a) by a person who was routinely acting for the business in reporting the information; or (b) in circumstances under which the statement would not be excluded by the hearsay rule; and
6. Neither sources of information nor the method or circumstances of preparation must indicate a lack of trustworthiness.
Cole Oil & Tire Co., Inc. v. Davis, 567 So.2d 122 (La.App. 2d Cir.1990).
These fact sheets are not the record of an event that was made at or near the time of the event. The last amended petition that added plaintiffs was filed on February 21, 2003. Each plaintiff obviously possessed knowledge of his cause of action at the time he was first listed as a plaintiff in the original or amended petitions. The plaintiffs were ordered to provide fact sheets on October 20, 2003. The earliest any fact sheet verification was signed by a plaintiff was October 2003.[3] Thus, plaintiffs were memorializing in the fact sheets their having gained knowledge sufficient to trigger prescription at least eight months after the last suit was already filed.
The source of the information on the fact sheets indicates a lack of trustworthiness. These sheets were prepared pursuant to a case management order. Among the information sought by the fact sheets, after defendants had filed exceptions of prescription, was a "detailed description of the injury or illness sustained, the date it was discovered, and learned that it related to [their] employment...." Their responses in the fact sheets dovetail with the *676 allegations presented in the third amended and supplemental petition of when the plaintiffs first became aware of their injuries or began fearing the risk of injuries. They are self-serving statements made by the plaintiffs at a time when they were aware that their cause of action was subject to being dismissed on an exception of prescription.
Finally, these fact sheets were not records made and kept in the course of a regularly-conducted business activity. The fact sheets were discovery responses tailored to comply with the case management order.
For the foregoing reasons, we cannot conclude that the trial court abused its discretion in not permitting the fact sheets to be introduced into evidence at the prescription trial.

CONCLUSION
At appellants' costs, the judgment is AFFIRMED.
NOTES
[1] Dr. Pennywell testified that in "a lot of instances" he called the plaintiffs to tell them about their scheduled screening.
[2] The "Mid-Continent Project" is apparently the name for litigation against the foundries relating to occupational exposure to harmful materials.
[3] Lloyd Watkins' verification shows it was notarized on February 11, 2003, which was before the case management order.