HIGGINBOTHAM, J.
*775 Defendant, Christopher Mullen, was charged by bill of information with molestation of a juvenile, a violation of La. R.S. 14:81.2(B). He pled not guilty. Subsequently, the State filed a superseding bill of indictment charging defendant with one count of aggravated rape (count one), a violation of La. R.S. 14:42,[1] and one count of molestation of a juvenile (count two). Defendant pled not guilty. Defendant filed a motion to suppress, which the trial court denied following a hearing. Immediately prior to trial, the indictment was amended to change the initials of the alleged victim from A.L. to A.S. During trial, defendant sought mistrial twice, but was denied by the trial court. After a trial by jury, defendant was found guilty as charged on both counts. The trial court imposed concurrent terms of life and twenty-five years imprisonment at hard labor, both to be served without the benefit of probation, parole, or suspension of sentence. Defendant now appeals, raising four assignments of error. For the following reasons, we affirm the convictions and sentences.
STATEMENT OF FACTS
On August 6, 2016, victim A.S.[2] disclosed ongoing abuse suffered at the hands of her father, defendant, to her boyfriend over Snapchat. At about 11:00 p.m., her boyfriend and his mother, Elizabeth Lashua, drove to A.S.'s home, picked her up, and brought her to their house.[3] On the way back to her house, Lashua called the police to report what A.S. had told her.
Detective Carley Messina, a sex crimes investigator for the St. Tammany Parish Sheriff's Office ("STSO"), testified at trial. Det. Messina said she met with A.S. at Lashua's home on August 8, 2016, and that A.S. disclosed a long history of abuse by her biological father, defendant. Det. Messina arranged for A.S. to call her father to discuss the abuse, while Det. Messina recorded it. A.S. did so, and the recording was played for the jury. Det. Messina explained during her initial testimony, and again on rebuttal, that she did nothing to edit the phone call. Det. Messina explained the phone call was in two segments because the call was disconnected and defendant called back. During the first phone call, the following exchange occurred.
A.S.: Uh, I think I might be pregnant.
Defendant: What, having sex with [your boyfriend]?
A.S.: No.
Defendant: Who'd you have sex with?
A.S.: I haven't had sex with [my boyfriend].
Defendant: Who'd you have sex with?
A.S.: Real funny, dad.
*776 Defendant: [A.S.], it has been ab- forever.
A.S.: It hasn't been that long.
Defendant: Yes it has.
A.S.: No, it really hasn't.
Defendant: Yeah, it has.
A.S.: No, it actually hasn't.
Defendant: [A.S.], you're not pregnant.
A.S.: Yes, I think I am, dad.
Defendant: How do you say that?
A.S.: Because I've been having morning sicknesses.
Defendant: You're full of shit. Where are you fucking at?
A.S.: I'm not kidding, dad.
Defendant: Where the fuck are you at?
A.S.: Dad, why are you being like this?
Defendant: 'Cause I want to know where you're at, and why you left my house at eleven o'clock in the morning and have had me worried for fucking three days.
A.S.: I need to know when the last time was because I think I might be pregnant.
Defendant: [A.S.], I want to know where you're at.
A.S.: I need to know when the last time was. I think I might be pregnant.
Defendant: [A.S.], who's around?
A.S.: Nobody. I'm by myself right now.
Defendant: Where are you!
A.S.: Dad, I need to know when the last time was.
Defendant: [A.S.], I need to know where you're at.
A.S.: I need to know when the last time was, dad.
Defendant: I don't know. I don't remember.
After repeatedly telling A.S. to shut up and that he did not know what she was talking about, defendant asked, "Where you at? At a police station trying to get me put in jail?"
Following the phone call, Det. Messina set up an interview that day at the Children's Advocacy Center ("CAC") to be conducted with A.S. by a staff member there, while Det. Messina observed outside of the room. The interview was played for the jury.
In the interview, A.S. described how when she was between six and eight years old, defendant grabbed her "girl areas," and briefly engaged in anal intercourse. Further, she explained that the abuse began "when [she] was very, very little," and continued until about a month prior to the outcry to her boyfriend. A.S. detailed the last incident in which she told defendant to stop, and how defendant had said he would, but that he never did. She said on that occasion, defendant inserted his penis into her vagina, that it hurt, and that he did not stop. She claimed defendant wanted to put her on birth control "for a long time" before, but could not because he did not have primary custody. She said he started vaginally raping her when she was around eleven years old while she lived with defendant in New York State. Defendant continued the vaginal and occasional oral intercourse after they moved back to Louisiana when she was around the age of thirteen. A.S. told the interviewer how defendant thought what he was doing was ok and that he told her he wanted her to experience everything with him first. She explained how defendant would have inappropriate contact with her "every two days" before she stopped it for good about a month before the outcry to her boyfriend. Defendant would ground A.S. and "be really mean to [her]" if she told him no. A.S. described how when she was "a little girl," defendant would cover his penis with syrup or "a liquid that would taste good" and force her to perform oral sex.
*777 A.S. explained that she did not reveal the continuing abuse to her mom because she did not want to "break" her mom, who was "so in love" with defendant. She further revealed that her mother has multiple sclerosis. While A.S. had told her mother of the abuse before, she wasn't believed because A.S.'s older half-sister, A.L.S.,[4] made a similar outcry when A.S. was very young, but also was not believed. She also explained that her paternal grandmother had once walked in on defendant raping A.S., but did nothing after defendant insisted nothing was happening.
Subsequently, Det. Messina obtained an arrest warrant for defendant. During defendant's arrest on August 8th, unsolicited, he told his mother, "I think she told somebody I raped her." Defendant had not been informed why he was being arrested at the time he made the declaration. After being brought to Det. Messina's office, defendant executed a waiver of rights form. A video interview was then conducted, and the recording was played for the jury. During the interview, the following exchange occurred:
Det. Messina: So, look. And look. I know y'all had sex. Okay. Was this something that was okay with her? You know, was this something along the lines of, basically, like, I'm okay with it-
Defendant: I'm not saying I did it, so if it were okay with her, and she was of age when we did it, if we supposedly did it, so why would I go to jail over it? Why would I get arrested over someone being consensual over it?
Det. Messina also interviewed A.S.'s boyfriend, his mother Elizabeth Lashua, A.S.'s half-sister A.L.S., and Helene Parra, A.S.'s mother.
About two months later, Det. Messina brought A.S. to the Audrey Hepburn Care Center at Children's Hospital in New Orleans. There, A.S. was interviewed by forensic nurse practitioner Anne Troy. Troy provided substantial background as to her training and experience as a long-time forensic examiner, having interviewed thousands of children, and was qualified as an expert by the trial court as a forensic nurse practitioner. Through Troy, and after a lengthy description of how the records came to exist and be identified, who had created them, and their authenticity, the State introduced into evidence A.S.'s medical records generated from the forensic interview. After providing her background and training in delayed reporting of abuse, and over defendant's objection, Troy ultimately provided a diagnosis that A.S. was a victim of child sex abuse.
The State provided testimony from a St. Tammany Parish school administrator establishing that A.S. attended school in the parish from August 14, 2003 until August 26, 2005, and again from January 16, 2013 until the time of trial. A.S.'s maternal aunt, Sarah Giangrosso, testified and confirmed those dates relative to where A.S. and defendant lived prior to and after moving to New York. In 2014, A.S. and her mother moved in with Giangrosso so that Giangrosso could help take care of A.S.'s mother. Giangrosso testified that during that time, A.S. would "cry and ask not to go" when being "forced" to return to her father's house by her mother.
A.S. testified at trial. She said her first memory is of living in Pearl River, Louisiana in a trailer at the age of four, and that defendant would make her perform oral sex on him. She specified that he would use "something sweet like syrup or jelly so it wouldn't taste bad." A.S. explained she attempted to tell her mother and aunt about the forced oral sex, but her mother's *778 reaction scared her, so she said that her sister told her to say it. She said defendant "did anal" shortly thereafter with her. Later, while still in New York, when she was about ten or eleven she said defendant first began to vaginally penetrate her and perform oral sex on her. After another move in New York, her mother walked in on defendant vaginally penetrating A.S., but ultimately did nothing about it. A.S. related a similar circumstance regarding defendant's mother walking in on defendant penetrating her. Around the age of thirteen, the family moved back to Louisiana to live with defendant's mother. Defendant would vaginally penetrate A.S. there as well. A.S. detailed how defendant would get upset if she told him no, and would prevent her from visiting her boyfriend or friends. Specifically, A.S. testified that she would have to have sex with defendant in order to be allowed to visit her boyfriend.
A.L.S., A.S.'s half-sister, testified about her experiences being raped by defendant when she was around four or five. Specifically, she testified about defendant using strawberry "lube" on his penis when he forced her to perform oral sex, and to being anally raped by defendant. She also described how A.S. indicated to her that defendant had touched her inappropriately when A.S. was about four years old. A.L.S. also explained how her other sister told her that "what happened to [A.L.S.] also happened to her" at the hands of defendant.
Defendant testified. Defendant denied any inappropriate relationship with A.L.S., but did say he had heard she had previously claimed three different men, including defendant, had raped her. Defendant denied having sex with A.S., or ever using any substance on his penis while forcing A.S. to perform oral sex on him. Defendant speculated that A.S. accused him of the offenses only after "she started dating that boy." Defendant denied that his mother had ever seen him having sex with A.S. Defendant explained he said what he said to Det. Messina about arresting someone for consensual sex because he was "tired and wore out" after having been in custody for several hours. The prosecutor conducted an extensive, and sometimes contentious, cross-examination discussed in detail below. However, defendant ultimately claimed, without evidence, that there was more to his recorded phone call with A.S. that was somehow missing. On rebuttal, Det. Messina denied editing the recording in any way, and confirmed the recording played for the jury was the entirety of the phone call.
ASSIGNMENT OF ERROR # 1: ERRONEOUS DENIAL OF CAUSE CHALLENGE
In his first assignment of error, defendant contends that the trial court erroneously denied his challenge for cause of Juror 244.[5] Specifically, defendant argues that after Juror 244 disclosed that she had been a victim of childhood sexual abuse, the trial court "pressed" her into telling the court what it "needed" to hear. In response, the State argues that Juror 244 only told the trial court that despite her prior history she could be impartial.
As an initial matter, there is no indication in the record that defense counsel objected to the trial court's denial of his challenge for cause. As La. Code Crim. P. art. 800(A) provides:
*779 A defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling. The nature of the objection and grounds therefor shall be stated at the time of objection.
Consequently, any claim on appeal is waived. State v. Odenbaugh, 2010-0268 (La. 12/6/11), 82 So.3d 215, 237, cert. denied, 568 U.S. 829, 133 S.Ct. 410, 184 L.Ed.2d 51 (2012) (a defendant must object at the time of the ruling on the refusal to sustain a challenge for cause of a prospective juror); State v. Campbell, 2006-0286 (La. 5/21/08), 983 So.2d 810, 864, cert. denied, 555 U.S. 1040, 129 S.Ct. 607, 172 L.Ed.2d 471 (2008) (failure of defense counsel to object to the court's granting of the State's challenges for cause waived any complaint in this regard on appeal); State v. Cole, 161 La. 827, 835, 109 So. 505, 508 (1926) (defendant voluntarily accepting jurors after challenge for cause was overruled, held to indicate waiver of complaint that name was not drawn before exhaustion of venire was announced); State v. Mills, 2013-0573 (La. App. 1st Cir. 8/27/14), 153 So.3d 481, 486 writ denied. 2014-2027 (La. 5/22/15), 170 So.3d 982, writ denied sub nom, State ex rel. Mills v. State, 2014-2269 (La. 9/18/15), 178 So.3d 139 (defendant failed to preserve for appeal argument that trial court erred in denying for-cause challenges to certain prospective jurors, where defendant did not object at trial to rulings denying challenges).
In any event, a challenge for cause should be granted, even if the juror declares an ability to remain impartial, when the juror's responses reveal facts from which bias, prejudice or impartiality may be reasonably inferred. State v. Albert, 414 So.2d 680, 682 (La. 1982). A charge of juror bias may be removed if the prospective juror is rehabilitated, that is, if the court is satisfied that the juror can render an impartial verdict according to the evidence and instructions given by the court. State v. Gibson, 505 So.2d 237, 240 (La. App. 3d Cir. 1987), writ denied. 508 So.2d 66 (La. 1987). The trial judge has broad discretion and reviewing courts will not disturb its rulings absent an abuse of that discretion. State v. Dotson, 2016-0473 (La. 10/18/17), 234 So.3d 34, 39 ; State v. Miller, 99-0192 (La. 9/6/00), 776 So.2d 396, 405-06, cert. denied, 531 U.S. 1194, 121 S.Ct. 1196, 149 L.Ed.2d 111 (2001) ("reviewing court should accord great deference to the trial judge's determination and should not attempt to reconstruct the voir dire by a microscopic dissection of the transcript in search of magic words or phrases that automatically signify the jurors' qualification or disqualification."). However, if the judge erroneously denies a cause challenge and the defendant exhausts his peremptory challenges, prejudice is presumed. See e.g. State v. Hart, 96-0697 (La. 3/7/97), 691 So.2d 651, 656 ; State v. Ross, 623 So.2d 643, 644 (La. 1993). Moreover, a defendant must use a peremptory challenge, should he still have one, on the venire member in question. State v. Sparks, 88-0017 (La. 5/11/11), 68 So.3d 435, 460, cert. denied, 566 U.S. 908, 132 S.Ct. 1794, 182 L.Ed.2d 621 (2012) (defendant must use one of his peremptory challenges curatively to remove juror as to whom a challenge for cause was denied, thus reducing his remaining peremptory challenges, or waive any complaint on appeal as to denial of for-cause challenge). In the instant case, defendant exhausted his peremptory challenges, and used one on the panel member at issue, thus the only issue before this court is whether the trial court erred when it denied the cause challenge.
*780 Under La. Code Crim. P. art. 797(2), in relevant part, a defendant may challenge a juror for cause if "[t]he juror is not impartial, whatever the cause of his partiality..." After the prosecutor asked the panel, "[d]oes anyone else know anybody, friends or family, that was a victim of sexual assault," one panel member approached the bench to speak privately. Once at the bench, the following discussion was held:
Court: Okay, ma'am, what would you like to tell us?
Juror 244: I was molested by an uncle whenever I was a child, and there were never any charges brought. It was simply handled by my family. And I just would rather not talk about it, you know, out loud. But I mean it was years and years ago.
Court: So the fact that that took place, is that going to affect your ability to be a fair and impartial juror in this case?
Juror 244: I don't know. It's -
Court: Are you going to be able to listen to all the evidence and make a decision based simply off the evidence that comes out of this witness stand? Or in your mind is that going to -
Juror 244: I think I can be fair. I think I can.
Court: Well, we need that commitment from you that you will be fair, that you're able to put those things aside, and just listen to the evidence, and base your decision solely on the evidence. That's the test.
Juror 244: Okay.
Court: Can you do that?
Juror 244: Yes, yes.
Court: Any questions?
[Defense attorney] Burns: No.
Court: Thank you.
[Prosecutor] Alford: It might be that we continue to ask questions, but I won't be referencing what you told us up here. Does that make sense?
Juror 244: Okay.
Court: You do not have to disclose anything else in the jury box, because he's going to go into the details with things like this, and Mr. Bums may also.
Juror 244: Okay.
Court: Everybody good with that?
Burns: What?
Alford: I' m saying if it gets to the point where you feel like your answer would disclose something you're not comfortable with, you can ask to approach again.
Juror 244: Okay.
Burns: But more importantly, as Mr. Alford and I talk about the case and those type of things, if you come to some conclusion that you don't feel comfortable, you have to disclose that fact to us.
Juror 244: Okay.
Burns: Do you understand?
Juror 244: Yes.
Burns: Is that fair, Judge?
Court: That's fair.
Later, during challenges from both sides, the following exchange occurred:
Court: Juror No. 10. Juror No. 244...
Alford: Acceptable.
Burns: Cause, molested by her uncle. She's too close to it.
Alford: Judge, the same thing as Ms. Braud.
Court: We questioned her about that, and she indicated that she would be able to be a fair and impartial juror in this matter despite that experience.
Burns: Defense 7, excuse.[6]
*781 Here, defendant fails to demonstrate the trial court abused its considerable discretion in evaluating the response of Juror 244. In defendant's brief, the one line not reproduced is when Juror 244 explained, "But I mean it was years and years ago." Evidently, the trial court believed that Juror 244 could put her unfortunate past behind her and believed her when she said she could be impartial when considering the instant case. State v. Dorsey, 2010-0216 (La. 9/7/11), 74 So.3d 603, 631, cert. denied, 566 U.S. 930, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012) (the fact that a juror personally has been the victim of a crime will not necessarily preclude that juror from serving on a jury as long as the juror's partiality has been unaffected). When considered together with defendant's failure to object, this claim warrants no relief.
ASSIGNMENT OF ERROR # 2: HEARSAY
In his next assignment of error, defendant asserts that the medical records the State introduced through the testimony of forensic nurse practitioner Anne Troy constituted impermissible hearsay evidence. Though Troy was qualified as an expert, and as a part-time employee of the Audrey Hepburn Care Center at Children's Hospital, defendant claims the referenced records were not certified, fell outside the hospital records exception, and therefore constituted hearsay evidence. Moreover, defendant argues that he was not able to cross-examine all of the contributors to the documents who were identified in Troy's testimony. In response, the State urges that the records were admitted as regular business records, and the missing contributors were inconsequential to the underlying records presented.
As an initial matter, a trial court is generally accorded discretion concerning the admission or exclusion of evidence, and a trial court's decision to admit or exclude evidence will not be reversed absent an abuse of discretion. State v. Stokes, 2014-1562 (La. App. 1st Cir. 6/17/15), 175 So.3d 419, 423 ; Alexander v. Fulco, 39,293 (La. App. 2d Cir. 2/25/05), 895 So.2d 668. writ denied, 2005-0781 (La. 5/6/05), 901 So.2d 1107.
Hospital records are an express statutory exception to the hearsay rule.[7] Furthermore, when the statutory requirements have been satisfied, introduction of certified copies of hospital records does not deny a defendant the right to confront witnesses against him. See State v. Trahan, 332 So.2d 218, 219-20 (La. 1976) ; see also State v. Wientjes, 341 So.2d 390, 393-94 (La. 1976). Here, however, the records were not certified by the custodian hospital. That lack of certification is not fatal to their ultimate admission into evidence. Cf. Zavala v. St. Joe Brick Works, 2007-2217 (La. App. 1st Cir. 10/31/08), 999 So.2d 13, 18, writ denied, 2008-2827 (La. 1/30/09), 999 So.2d 762 (claimant's exhibits comprised *782 of document signed by doctor and document referring claimant for physical therapy rehabilitation deemed inadmissible in workers' compensation proceeding, where documents were uncertified, and no evidence appears in record to show documents had any degree of reliability and trustworthiness).
In this case, after first identifying the records through Det. Messina, the State later authenticated them with Troy. Subsequently, the records were admitted under the business records hearsay exception. In pertinent part, La. Code Evid. art. 803(6) provides:
Records of regularly conducted business activity. A memorandum, report, record, or data compilation, in any form, including but not limited to that which is stored by the use of an optical disk imaging system, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if made and kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make and to keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. This exception is inapplicable unless the recorded information was furnished to the business either by a person who was routinely acting for the business in reporting the information or in circumstances under which the statement would not be excluded by the hearsay rule. The term "business" as used in this Paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
The Louisiana Supreme Court distilled the requirements to satisfy the business records exception in State v. Juniors, 2003-2425 (La. 6/29/05), 915 So.2d 291, 326-27, cert. denied, 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006). The Court held:
To exclude business records from the hearsay rule and render them admissible, [La.] C.E. art. 803(6) requires the court to determine from testimony of either the "custodian or other qualified witness" that:
1. The record was made at or near the time of the event;
2. The record was made either by, or from information transmitted by, a person with knowledge;
3. The record was made and kept in the course of a regularly conducted business activity;
4. It was the regular practice of that business activity to make and keep such records;
5. The recorded information was furnished to the business either (a) by a person who was routinely acting for the business in reporting the information; or (b) in circumstances under which the statement would not be excluded by the hearsay rule; and
6. Neither sources of information nor the method or circumstances of preparation indicate a lack of trustworthiness.
Juniors, 915 So.2d at 326-27. Moreover, "[u]nder Art[icle] 803(6), it is essential that a custodian or other qualified witness testimonially explain the record-keeping procedures of the business and thus lay the foundation for the admissibility of the records." Juniors, 915 So.2d at 327 (citing Cole Oil & Tire Co., Inc. v. Davis, 567 So.2d 122, 129 (La. App. 2d Cir. 1990). Here, Troy did just that. Her position with the Audrey Hepburn Center is a forensic *783 nurse practitioner, and one of her duties is to interview and diagnose children suspected of being victims of sexual assault. She testified that she, a qualified witness, made the medical record contemporaneously with her forensic interview of A.S. from information provided by A.S. The records are maintained at Children's Hospital. Neither Troy's testimony about the document, or the document itself, provided any indicia of unreliability or a lack of trustworthiness in the record. Cole v. Celotex Corp., 599 So.2d 1058, 1082-1083 (La. 1992) (foundation for admission of medical records established under business record exception to hearsay rule; questions indicated that records were made by physician in regular course of business as provider of medical services); Austin v. Pascarelli, 612 So.2d 201, 208-209 (La. App. 4th Cir. 1992), writs denied, 614 So.2d 1256, 1257 (La. 1993) (medical bill offered by automobile accident plaintiff not admissible under business records exception where neither physician who sent bill nor anyone from his office testified regarding bill).
Moreover, while defendant contends there were portions of the document created by other individuals not present, those contributions were immaterial to the purpose for which the records were introduced. Troy indicated that A.S.'s vital signs were taken and recorded by an LPN, that a resident she directly supervised took down some of the information A.S. provided to Troy, in Troy's presence, and that an administrative employee faxed the record to law enforcement.[8] Notwithstanding defendant's complaint the records were "an unsworn record that could not be tested through cross-examination," the report's actual author was ably cross-examined by trial counsel. Defendant fails to show the trial court abused its discretion in admitting the documents into evidence through the business records exception.
ASSIGNMENT OF ERROR # 3: IMPROPER EXPERT TESTIMONY
In his third assignment of error, defendant posits the trial court erred in not granting his motion for mistrial when Troy gave an opinion as to an ultimate fact reserved for determination by the fact finder, namely the credibility of A.S. Defendant contends that the trial court improperly allowed the Troy' testimony to exceed the permissible bounds of expert testimony in violation of the rules of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), State v. Foret, 628 So.2d 1116 (La. 1993), and State v. Chauvin, 2002-1188 (La. 5/20/03), 846 So.2d 697. The State argues in response that this court recently found no error in a case "materially indistinguishable" from the instant one. State v. Griffin, 2015-1765 (La. App. 1st Cir. 4/27/16), 2016 WL 2840309 (unpublished). The State further argues Troy's statements constituted a medical diagnosis, not a criminal finding of fact.
In Foret, the defendant had been charged with molestation of a juvenile. See Foret, 628 So.2d at 1117. At trial, the State presented testimony from Dr. William Janzen, Ph.D., who qualified as an expert in the field of psychology with expertise in child sexual abuse. See *784 Id. at 1118. Dr. Janzen testified that he interviewed the victim on three separate occasions and concluded, in his expert opinion, she was telling the truth about being the victim of sexual abuse. See Id. at 1119. As the basis for this opinion, Dr. Janzen relied upon factors present in Child Sexual Abuse Accommodation Syndrome ("CSAAS"). See Id. at 1123-24. Notably, Dr. Janzen described specific details of the allegations made by the victim and, with the court's permission, named the defendant as the person whom the victim identified as her abuser. See Id. at 1119. Dr. Janzen stated, "[t]he details that [the victim] gave me are consistent with the dynamics of sexual abuse and so my conclusion would, therefore, be that she has been sexually abused and should be in counseling to help her cope with that." See Id. at 1120. Subsequently, Dr. Janzen summed up his testimony by stating that, given the details related to him by the victim and considering the various dynamics of sexual abuse, his only conclusion was that the victim had been sexually abused. See Id.
The court in Foret found that Dr. Janzen's CSAAS-based testimony was of "highly questionable scientific validity," and failed to unequivocally pass the Daubert threshold test of scientific reliability. See Id. at 1127. The court further determined that the use of CSAAS-based testimony for the purpose of bolstering a witness's credibility created a risk of prejudice that outweighed the evidence's questionable probative value, and thus, such opinion testimony as a determinant of the victim's credibility was not admissible. See Id. at 1129.
The Foret court did note that this sort of expert testimony must focus on why "superficially bizarre" reactions such as delayed reporting take place in some cases. See Id. at 1130. Such opinion testimony must seek to demonstrate or explain in general terms the behavioral characteristics of child abuse victims in disclosing alleged incidents without giving testimony directly concerning the particular victim's credibility. See Id. If the testimony is limited in this way, then it is of assistance to the jury in evaluating the psychological dynamics and resulting behavior patterns of alleged victims of child abuse, where the child's behavior is not within the common experience of the average juror. See Id.
In Chauvin, the defendant was convicted of indecent behavior with juveniles. Chauvin, 846 So.2d at 698 . At trial, the State presented the expert testimony of a licensed clinical social worker who testified that one of the victims had been diagnosed as suffering from Posttraumatic Stress Disorder ("PTSD"). The social worker then testified that the symptoms of PTSD were consistent with a child who had been sexually abused. See Id. at 699-700.
The Louisiana Supreme Court found that the testimony of the social worker violated the rules of Daubert and Foret . The Court noted that the State did not limit the testimony in an attempt to explain delayed reporting, and it found no showing that PTSD evidence was reliable and accurate as substantive proof of sexual abuse. See Id. at 708-09.
In Griffin, the State offered the testimony of Anne Troy, the same nurse practitioner as in the instant case. This court found the testimony proper where there was a "critical difference" between her testimony and that at issue in both Foret and Chauvin . Griffin, 2016 WL 2840309. In Griffin, this court noted Troy did not "rely upon a collateral diagnosis, such as CSAAS or PTSD, to conclude a finding of sexual abuse." Id. Troy did not "definitively state" the victim had been abused, but instead agreed with the State "that her observations of the victim's demeanor, as *785 well as the physical findings, were 'consistent with a child who has been abused', even with a normal physical examination." Id. At a pretrial Daubert hearing, Troy said she would "never give an opinion at trial" as to the victim's credibility regarding the sexual abuse claim. Id.
In summary, this court found Troy's testimony "had a twofold effect outside of simply serving to bolster the victim's credibility." Id. First, Troy's testimony served to explain that victims of childhood sexual trauma "often do not present signs of physical trauma from the abuse." Id. Second, the general description of delayed reporting assisted the jury in understanding the " 'superficially bizarre' reactions" in the case. Id.
In the instant case, the State offered Troy as an expert forensic nurse practitioner specializing in child maltreatment. Troy examined the victim and provided general testimony about her examination protocols, the not uncommon absence of physical evidence in long term sexual abuse of children, and the etiology of delayed reporting of child sex abuse. Further, Troy described the "red flags" she looked for in a child's version of events that indicated coaching or fabrication versus truthfulness. Troy did repeat A.S.'s allegation that she had been abused multiple times by her biological father. However, Troy did not present any explicit testimony regarding CSAAS or PTSD, nor did she describe any of the specific incidents of abuse described by A.S. Finally, the following exchange occurred on direct examination after Troy had been accepted as an expert witness by the trial court:
Prosecutor: What was your ultimate diagnosis in this case after examining [A.S.]?
Troy: Child sex -
Defense attorney: Let me object. No, go ahead. I'm going to move for a mistrial. Just go on ahead.
Prosecutor: Well, you examined [A.S.], correct, on October 19, 2016?
Troy: Yes, I did.
Prosecutor: And what was [sic] your findings?
Troy: And, again, she has a history that's clear - what we're looking for if you're looking is she's got a clear and detailed history that she provided to me. It did not have any of those red flags that had me concerned for her, either having a psychiatric illness or having been coached, so, therefore, that was consistent with her being normal in her physical findings. So most child sexual abuse is diagnosed based on the history presented to us. So I made the diagnosis of child sexual abuse and did all the lab work involved in that.
Following the exchange, defense counsel again objected and orally moved for mistrial, which the trial court denied.
Applying the facts of this case to the court's reasoning in Griffin , itself distilling the central holdings of both Foret and Chauvin , Troy's testimony regarding delayed reporting and a lack of physical evidence was proper to aid the jury in understanding the sometimes unintuitive nuances of child sex abuse. See also State v. Hampton, 2013-0580 (La. App. 4th Cir. 2/19/14), 136 So.3d 240, 247 (trial court acted within discretion in admitting expert physician witness's opinion testimony about delayed disclosure of child sexual abuse where testimony presented opinion only about general characteristics that would explain a delay in reporting sexual abuse, and witness did not express any opinion whatsoever about credibility of the victim in instant case); State v. Green, 2006-0940 (La. App. 1st Cir. 11/3/06), 2006 WL 3107890 (unpublished), writ denied *786 sub nom, State ex rel. Green v. State, 2006-2622 (La. 8/15/07), 961 So.2d 1158, writ denied sub nom, State v. Green, 2006-2846 (La. 8/31/07), 962 So.2d 444 (no error where expert witness "assisted the trier of fact in understanding the delayed disclosure of the victims" by testifying generally about delayed reporting that "children do not lie about sexual abuse because ... it is going to create more difficulties and trouble for them than possibly bring them any benefit."); State v. Myles, 2004-434 (La. App. 5th Cir. 10/12/04), 887 So.2d 118, 125 (in case in which an expert testifies, the expert's opinion testimony must explain in general the behavioral characteristics of child abuse victims in disclosing alleged incidents without giving an opinion directly concerning the particular victim's credibility).
However, in this case, unlike in Griffin , Troy gave an unequivocal statement regarding A.S.'s credibility by conclusively diagnosing her as having been a victim of child sex abuse, be it solely a medical diagnosis or otherwise. Therefore, unless that clear error was harmless, defendant's conviction should be vacated and the case remanded for new trial. See e.g. State v. Vidrine, 2008-1059 (La. App. 3d Cir. 4/29/09), 9 So.3d 1095, 1111, writ denied, 2009-1179 (La. 2/26/10), 28 So.3d 268 (expert's statements were inadmissible as testimony impermissibly bolstered victim's testimony and, in all probability, made it more believable to jury); Myles, 887 So.2d at 126 (expert testimony on victim's credibility is prejudicial when it puts expert's stamp of truthfulness on witness's testimony, bolstering it artificially to increase its probative strength with the jury). The proper analysis for determining harmless error "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) ; State v. Johnson, 94-1379 (La. 11/27/95), 664 So.2d 94, 100-01 ("Trial error" occurs during presentation of case to trier of fact and may be quantitatively assessed in context of other evidence to determine whether its admission at trial is harmless beyond a reasonable doubt).
Here, defendant essentially admitted (or at least did not deny) the abuse in the recorded phone call with A.S. When being arrested, defendant sua sponte told his mother that "I think she told somebody I raped her." When in custody, defendant posed "hypothetical" questions regarding whether a crime had even been committed if all parties were of-age and consented. A.L.S. testified that she suffered very similar abuse at the hands of defendant when she was a young girl when defendant put strawberry flavored substance on his penis when he forced her to perform oral sex. In addition to the CAC video being played for the jury, A.S. herself testified with great detail and did so consistently regarding the abuse she suffered over her lifetime.
While there are not many cases in Louisiana jurisprudence to find such error harmless, there are at least some. Green, 2006 WL 3107890 at P. 7 (testimony of clinical psychotherapist "violated the principles" of Daubert , Foret , and Chauvin , but based on entire record, error harmless) (Welch, J. concurring); State v. Murphy, 34,624 (La. App. 2d Cir. 4/6/01), 785 So.2d 197, 205, writ denied, 2001-1259 (La. 3/22/02), 811 So.2d 920 (expert's testimony on whether minor victim was coached to accuse defendant of sexual abuse was testimony commenting on credibility of victim and, as such, was inadmissible; however, admission of such testimony was harmless error since, without considering this testimony, *787 trier of fact could have found, based on defendant's own statement, that he raped or attempted to rape victim); State v. Johnson, 94-1369 (La. App. 4th Cir. 3/16/95), 652 So.2d 1069, 1078, writ denied, 95-0966 (La. 10/13/95), 661 So.2d 494 (assuming the comment at issue bolstered credibility of victim, allowing comment was harmless error when considered in light of all of the evidence, particularly the presence of venereal warts around victim's anus, the medical testimony establishing the probability that he got those from sexual contact and that his mother, with whom it can be presumed defendant had engaged in sexual relations, had a condition, one cause of which was venereal warts). While the improperly admitted testimony of Troy was not an insubstantial part of the State's case against defendant, given the more substantial evidence properly admitted against defendant regarding both offenses, the denial of mistrial after Troy's comment on the victim's credibility was ultimately harmless error.
ASSIGNMENT OF ERROR # 4: IMPROPER PROSECUTORIAL STATEMENTS
In his final assignment of error, defendant asserts the prosecutor made several improper statements regarding the credibility of defendant's statements while testifying at trial. Defendant moved for mistrial after the prosecutor allegedly ignored the trial court's admonishments to stop making such statements. Though he cites no authority, defendant claims prejudice as a result of the statements. In turn, the State argues that none of the statements ran afoul of La. Code Crim. P. art. 770, and further that none rose beyond necessitating admonition. La. Code Crim. P. art. 771. The State cites Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) as providing examples of extreme prosecutorial conduct that came close to requiring a mistrial. Further, in addition to noting the trial court's admonishments, the State notes the jury was instructed that statements of counsel are not evidence.
When an irrelevant or immaterial remark that is of such a nature that it might prejudice the defendant is made within the hearing of the jury, the defendant or the state may require that the court admonish the jury to disregard the remark or comment. La. Code Crim. P. art. 771. A mistrial shall be ordered when prejudicial conduct in or outside the courtroom makes it impossible to obtain a fair trial. La. Code Crim. P. art. 775. A mistrial is a drastic remedy, however, warranted only if a comment or remark results in substantial prejudice to the accused, State v. Broaden, 99-2124 (La. 2/21/01), 780 So.2d 349, 360 n.5, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001), and a trial judge has broad discretion in determining whether conduct is so prejudicial as to deprive the accused of a fair trial. State v. Sanders, 93-0001 (La. 11/30/94), 648 So.2d 1272, 1288-89, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996). It is settled that "[a] trial court's ruling denying a mistrial will not be disturbed absent an abuse of discretion." State v. Givens, 99-3518 (La. 1/17/01), 776 So.2d 443, 454 (citing State v. Narcisse, 426 So.2d 118, 133 (La. 1983), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983) ). Comments must be viewed in light of the context in which they are made. State v. Webb, 419 So.2d 436, 440 (La. 1982). Moreover, for defendant to prevail he must first show the verdict is attributable to the error. State v. De ru ise, 98-0541 (La. 4/3/01), 802 So.2d 1224, 1241, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001) ("defendant has not demonstrated that those remarks... so influenced the jury as to undermine the *788 reliability of the jury's verdict."); State v. Kitts, 2017-0777 (La. App. 1st Cir. 5/10/18), 250 So.3d 939, 968 (even when prosecutor's statements and actions are excessive and improper, credit should be given to the good sense and fair-mindedness of the jurors who have seen the evidence and heard the arguments, when evaluating a motion for mistrial).
Noted by defendant on appeal, during his cross-examination, the following exchanges occurred, and for each an objection was lodged:
Q. You ended on asking the jury you hope they believe your story. Do you think they're buying it?
A. I don't know.
Q. You don't know?
A. Do you think they're buying it?
Q. No, I don't think they're buying it.
A. We'll find out I guess, won't we.
Q. It sounds like you have raped every little girl that's been under your roof. Is that true?
A. No.
Q. No. You had to think about it, though, didn't you?
* * *
Q. Did you rape your other two daughters?
A. No.
Q. No? Now, you went through a lot of the history, and it seems like you agreed to pretty much everything [A.S.] testified to. Of course, you denied, even though very meekly, the allegation of rape -
* * *
Q. Your daughter says to you -
A. I know what she said, and I just gave you an answer, and you're going to ask me the same question continuous?
Q. Yes, because your answer doesn't make sense.
* * *
Q. So, again - but what you are saying - we just have to get answers out of you. Since there, according to you, was more to that call, it was cut out -- is that what your testimony is?
A. Well, I guess so, if I'm saying there was more to that call, right?
Q. It's a yes or no answer?
A. Yes.
Q. And so, therefore, if there's portions of the call cut out, Carley Messina cut them out?
* * *
Q. No other reason she would be saying this?
A. No.
Q. Again, y'all had a good relationship?
A. Yeah.
Q. Okay. Now, you have an answer, albeit a terrible -
* * *
Q. And then you respond, well, I would have to talk to a lawyer first before I talk anymore -
A. Yeah, because I was done talking to her. I heard what I needed to hear. So at that point, it's, yeah, let me just go ahead and talk to my lawyer so I can get out of here.
Q. And then you learned the consent route wasn't a very good idea either?
* * *
Q. So she didn't need to go through with this, because at the time, you don't know if she's talking to cops. She was free to go?
A. Well, I kind of figured it out. Why do you think at the end of the phone I asked that question, and that's when they hung up on me, because they knew I figured it out and so it was done.
Q. The damage was done.
*789 * * *
Q. No, I'm talking about your statement, your recorded statement to Carley Messina when you've already been arrested?
A. Well, it is. It's her word against mine, isn't it?
Q. You still think that's the case with that call?
A. Yeah, I still think it's her word against mine.
Q. I don't think the jury sees it that way.
Burns: Objection. I move for a mistrial.
Court: Sustained. Disregard the comments made by the Assistant District Attorney. Denied.
We have reviewed the prosecutorial comments made during cross-examination of defendant and find that none, either alone or in the aggregate, rose to the level that would have influenced the jury, contributed to the verdict, or that warrant reversal of defendant's conviction. See e.g. Kitts, 250 So.3d at 967-69 (prosecutor's alleged misconduct, arising from his statement implying that codefendant killed victim, failure to comply with trial court's order to give defense notice of any deal within 24 hours of the deal being made, use of terms such as "my jury" and "my jurors," and instruction to witness to raise "your right hand," as if prosecutor was an officer authorized to administer oaths, did not warrant drastic remedy of mistrial in murder prosecution; prosecutor's statements and actions did not make it impossible for defendant to obtain fair trial and there was overwhelming evidence of defendant's guilt); United States v. Orr, 692 F.3d 1079, 1097-98 (10th Cir. 2012), cert. denied, 568 U.S. 1184, 133 S.Ct. 1300, 185 L.Ed.2d 227 (2013)(prosecutor's misstatements of the evidence in cross-examining defendant or in closing argument were not so prejudicial as to deprive defendant of a fair trial; defendant had a chance to respond and correct the prosecutor's misstatement during questioning, court instructed the jury that counsel's statements were not evidence, and defendant was not convicted on tax evasion charges to which misstatement in closing argument related). Moreover, the trial court gave several admonitions to the prosecutor and jury highlighting the improper nature of some of the comments, and the instruction that an attorney's statements are not evidence. Defendant's final claim is without merit.
CONVICTIONS AND SENTENCES AFFIRMED.
Whipple, C.J. concurs and assigns reasons

Defendant was charged for an offense occurring prior to the 2015 amendment to the statute by Acts 2015, No. 256, § 1.

In accordance with La. R.S. 46:1844(W), the initials for the minor victim will be used. A.S.'s date of birth is June 17, 1999.

Lashua's husband and step-son were also in the vehicle.

In accordance with La. R.S. 46:1844(W), the subject is referenced only by her initials.

Due to the sensitive nature of the subject matter discussed, we will refer to her only by number.

"Defense 7, excuse" appears to be defense counsel's shorthand for seeking a peremptory challenge.

La. R.S. 13:3714(A) provides:
Whenever a certified copy of the chart or record of any hospital, signed by the administrator or the medical records librarian of the hospital in question, or a copy of a bill for services rendered, medical narrative, chart, or record of any other state health care provider, as defined by R.S. 40:1299.39(A)(1) and any other health care provider as defined in R.S. 40:1299.41 (A), certified or attested to by the state health care provider or the private health care provider, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the bills, medical narrative, chart, or record is sought to be used may summon and examine those making the original of the bills, medical narrative, chart, or record as witnesses under cross-examination.

Though the issue is not raised here, there is no issue of any confrontation clause violation arising from the contributions of the nurse and medical resident. Confrontation errors are subject to the harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). As noted, there was no information of consequence contributed by either party, and both were arguably non-testimonial statements that did not require their availability for cross-examination. See generally Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).